# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-3050

_____

Joseph H. Whitney

*Plaintiff - Appellant*

v.

The Guys, Inc.; Agora Solution Corp.; MyBillingServices, Inc.; Info Billing, Inc.;
MyTeleservices, Inc.; LaurenTel, Inc.; GreenTreeData, Inc.; LowCostBilling, Inc.;
YourBillingSolutions, Inc.; MySuperLotto, Inc.; MyPrizeAwards Corp.;
MyServiceAndSupport, Inc.; XYZ, Inc.; John R. Morrison

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 16, 2012
Filed: November 6, 2012

_____

Before RILEY, Chief Judge, MELLOY and SMITH, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff Joseph H. Whitney appeals the district court's dismissal of his
declaratory judgment, contract, unjust-enrichment, tort, and shareholder claims.
Applying a choice-of-law analysis, the district court dismissed the contract and

unjust-enrichment claims as barred by a Delaware statute of limitations and dismissed the tort and declaratory judgment claims as derivative of the contract claims. The district court dismissed the shareholder claims as insufficiently pleaded pursuant to Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 555 (2007). We reverse as to the shareholder claims but affirm in all other respects.

I.

We set forth the facts as alleged by Whitney in a second amended complaint.

Whitney is a Texas citizen domiciled in Texas. He owns an office property in Minnesota. Defendant John R. Morrison is a Minnesota citizen domiciled in Minnesota. Several of the defendant corporations are Delaware corporations with their principal places of business located in Whitney's office property in Minnesota.[1] The term "XYZ, Inc.," appearing in the caption above, is a label Whitney attaches to defendants he characterizes as "unknown derivative business entities." The remaining named corporate defendants are Delaware corporations with their principal places of business in states other than Minnesota.[2]

On April 25, 2005, Whitney and defendant John R. Morrison formed The Guys, Inc., in accordance with an unwritten contract. Pursuant to the contract, Whitney paid $150,000 and was to receive a one-half ownership interest in The Guys, Inc. Several

---

[1]The Guys, Inc., Agora Solution Corp., MyTeleservice, Inc., GreenTreeData, Inc., LowCostBilling, Inc., MySuperLotto, Inc., and MyPrizeAwards Corp.

[2]MyBillingServices, Inc., LaurenTel, Inc., and Your BillingSolutions, Inc., have their principal places of business in North Carolina. Info Billing, Inc., has its principal place of business in California. MyServiceAndSupport, Inc., has its principal place of business in Wisconsin.

of the above-named defendant corporations were already in existence and were to be wholly owned subsidiaries of The Guys, Inc.[3] One defendant corporation was yet to be formed and was to be a wholly owned subsidiary of The Guys, Inc.[4] Finally, Whitney was to receive a one-half ownership interest in the remaining named defendant corporations not wholly owned by The Guys, Inc.[5]

In November 2005, Whitney made a capital contribution of $25,000 to defendant Agora Solution Corp. According to Whitney's complaint, even though he paid a total of $175,000 and was to receive ownership interests as described above, he either was not given such ownership or was not given evidence or acknowledgment of such ownership. He also was denied access to an accounting, a share of profits, and a right to participate in corporate affairs. Whitney does not allege specifically what he asked for, when he asked for it, or how it was denied in relation to these purported denials (other than, of course, the demand for such items inherent in service of the present complaint). He also does not allege any specific contract terms related to these denials or obligations other than, implicitly, those that might exist pursuant to Delaware law if he were an owner. He alleges generally and in the alternative that Morrison absconded with his funds, that the corporate defendants retained his funds without granting him an ownership interest, and that he is, in fact, an owner of the defendant corporations but that his ownership merely has not been honored.

Whitney asserts that these general allegations concerning the failure to grant or acknowledge his ownership and Morrison's solicitation of his funds (and

---

[3]MySuperLotto, Inc., Agora Solution Corp., and MyServiceAndSupport, Inc.

[4]MySportsStats, Inc.

[5]MyBillingServices, Inc., Info Billing, Inc., MyTeleservices, Inc., LaurenTel, Inc., GreenTreeData, Inc., LowCostBilling, Inc., YourBillingSolutions, Inc., and MyPrizeAwards Corp.

-3-

Morrison's or one or more corporate defendants' retention of his funds) support the following ten counts of his complaint: declaratory judgment, breach of contract, promissory estoppel, unjust enrichment, fraud, misrepresentation of intention, accounting, breach of shareholder's rights/receiver/liquidation, breach of fiduciary duty, and conversion.

Additional facts alleged and relevant to our analysis are as follows. In paragraph fourteen of the complaint, where Whitney first alleges he paid $150,000, he does not state to whom he paid this amount. In a later paragraph of the complaint, however, he states, "Corporate Defendants accepted Whitney's one hundred seventy-five thousand dollar[s] ($175,000) of capital contributions that Whitney made at Morrison's request." Whitney ultimately asserts his breach of contract and most of his other claims against the corporate defendants as well as Morrison.

Whitney filed his complaint on October 20, 2010, more than five years after the date of the purported contract and initial payment. Defendants moved to dismiss, and the district court granted the motion, holding that the declaratory judgment claim seeking a declaration of rights pursuant to a purported contract was duplicative of the breach of contract claim and required dismissal with prejudice. The district court then characterized the fraud, misrepresentation of intent, and conversion claims as tort claims. The court concluded "the wrongful conduct underlying these tort claims is identical to Whitney's contract claim—that Morrison promised to give him one-half ownership of certain corporate entities in exchange for monetary contributions, and Morrison thereafter failed to recognize Whitney's ownership interest." The court concluded Whitney could not maintain a separate tort claim in these circumstances and dismissed these three tort claims with prejudice.

The court then characterized the breach-of-contract, promissory estoppel, and unjust-enrichment claims as contract or quasi-contract claims and applied a choice-of-law analysis as set forth in Jepson v. General Casualty Co. of Wisconsin, 513 N.W.2d

-4-

467, 469 (Minn. 2000). The court concluded that Delaware, rather than Minnesota, law controlled, and the court dismissed these contract claims with prejudice as time barred by a three-year Delaware statute of limitations.

Finally, the court looked at the remaining shareholder claims and found that the pleadings failed to satisfy the Twombly standard. The court dismissed the shareholder claims without prejudice.

II.

We review de novo the district court's dismissal of the complaint. Our de novo review applies to the choice-of-law analysis behind the dismissals. Eggleton v. Plasser & Theurer Exp. Von Bahnbaumaschinen Gesellschaft, MBH, 495 F.3d 582, 585 (8th Cir. 2007).

A.    Choice of Law

Whitney argues that Minnesota law applies and that his claims were timely pursuant to Minnesota's six-year statute of limitations. Minn. Stat. § 541.05 subd. 1(1). Defendants argue that Delaware law applies and that Whitney's claims are time barred by Delaware's three-year statute of limitations. Del. Code Ann. tit. 10, § 8106(a).

In determining which state's law applies, we generally employ the forum state's choice-of-law rules. See Eggleton, 495 F.3d at 585. Minnesota's choice-of-law rules involve a multistep analysis. Christian v. Birch, 763 N.W.2d 50, 56 (Minn. 2009). The first step requires examination of whether the different states' laws actually present a conflict, i.e., "if the choice of one forum's law over the other will determine the outcome of the case." Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co. 604 N.W.2d 91, 94 (Minn. 2000). Here, the statute-of-limitations issue makes the choice

of law outcome-determinative, so there is an actual conflict.  See, e.g., Christian, 763 N.W.2d at 56 ("The district court correctly determined that there was an outcome-determinative conflict between the Minnesota and Wisconsin statutes of limitations.").[6]

The second step requires determination of whether the different states' laws constitutionally may be applied to the case at hand.  Jepson, 513 N.W.2d at 469.  The parties agree that the application of Minnesota law presents no constitutional concerns.  Whitney argues, however, that the application of Delaware law to his contract claims is not constitutionally permissible.

The district court determined, "The subject of the purported contract was ownership of Delaware corporations, and the alleged breach involved those same corporations' conduct and actions regarding their ownership.  In the Court's view, this is sufficient contact to permit Delaware law to constitutionally apply."  We agree.  It is constitutional to apply a given state's law to a dispute if that state has a "significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  Allstate Ins. Co. v. Hague, 449 U.S. 302, 312–13 (1981).  Here, given the subject matter of the alleged contract, the alternative pleading (breach by Morrison and breach by defendant corporations), and the relevancy of Delaware law to determining the ownership issues inherent in the contract claims,

---

[6]For claims arising after April 2004, a Minnesota statute calls for application of the statute of limitations from the state whose substantive law applies to a claim.  Minn. Stat. Ann. § 541.31 subd. 1 (a)(1).  For claims arising prior to that time, Minnesota recognized a general choice-of-law distinction between procedural and substantive issues of law.  Statutes of limitation were deemed procedural for common law claims, and Minnesota's statute of limitations applied to such claims.  Statutes of limitation were deemed substantive for claims asserting statutorily created rights, and for determining which statute of limitations to apply to such claims, the normal choice-of-law analyses applied.  The cases addressing these distinctions, however, involved claims that arose prior to the effective date of § 541.31.

there is nothing "arbitrary nor fundamentally unfair" about applying Delaware law. In fact, beyond the allegation of a promise to grant an ownership interest, the pleadings omit any specific allegations concerning the source of purported duties owed by the defendants to Whitney. In the absence of specific allegations surrounding the terms of the alleged oral contract, any analysis of duties owed to Whitney by the Delaware corporate defendants in the present case—*e.g.*, an accounting, share in profits, evidence of ownership—turn almost entirely on an analysis of Delaware corporate law. In this regard, Whitney, as the master of his own pleadings, named the corporations, and not just Morrison, as defendants. It is not the case, then, that a court could properly analyze the contract claims in this case and award Whitney the relief he seeks solely with reference to an individual natural person's duties under a particular state's contract law.

The third step requires application of a multifactored test, considering the: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law." Jepson, 513 N.W.2d at 470. Courts commonly refer to these factors as "Leflar's five choice-influencing factors," and the factors represent a common test used in different states of our circuit. See, e.g., Hughes v. Wal-Mart Stores, Inc., 250 F.3d 618, 620 (8th Cir. 2001) (applying Arkansas law); see also Robert A. Leflar, Choice-Influencing Considerations in Conflicts Law, 41 N.Y.U. L. Rev. 267, 279 (1966) (proposing the five factor test). Although presented as a list, "[t]hese factors were not intended to spawn the evolution of set mechanical rules but instead to prompt courts to carefully and critically consider each new fact situation and explain in a straight-forward manner their choice of law." Jepson, 513 N.W.2d at 470.

Given this practical description of the test by the Minnesota Supreme Court, it is clear that some factors may tend to be more important in certain types of cases, whereas other factors may carry less weight. For example, in the present case where

the conflict centers on competing statutes of limitations, the fifth factor, "application of the better rule of law," would seem to be relatively unimportant. Legislatures rather than courts are best positioned to assess the comparative merits of the competing policy concerns surrounding the selection of particular limitations periods for different causes of action. As such, because the Minnesota and Delaware legislatures themselves weighed policy considerations and reached different conclusions, we are ill-suited to determine which of the two limitations periods represents the better rule of law. See Hughes, 250 F.3d at 621 ("Courts often refrain from resolving a conflict of law question based on the better rule of law factor, recognizing that states often have competing policy considerations for governing similar transactions or events in different manners such that the laws do not necessarily lend themselves to being labeled either 'better' or 'worse.'").

In contrast, the first and third factors—"predictability of results" and "simplification of the judicial task"—merit substantial weight in the present case and favor the application of Delaware law. Any specific rights at issue concerning share ownership, duties under the purported contract, and possible remedies do not exist in a vacuum. They must find definition in some source of law if not provided by express contractual language. Here that law is Delaware law. The district court concluded, "Whitney's contract and quasi-contract claims cannot be separated from the 'internal affairs' of the corporate defendants." Discussing the alleged oral contract, the court stated, "Whitney identifies no contractual terms that obligated Defendants to act in any of the ways he claims they failed to act; rather, the rights and obligations at issue exist under Delaware corporate law." The court also concluded it could not grant Whitney the relief he requested "without directly impacting and disrupting the current ownership structure of the corporate Defendants." We agree.

Had Whitney alleged more detail concerning possible duties and rights created by the terms of the purported oral contract, predictability concerns might allow us to conclude that Minnesota law should apply. Such detail might have provided a

feasible and potentially simple basis for assessing such duties and rights. Whitney makes no such allegations, however, and as such, we believe that the parties to this purported commercial transaction must have expected the duties of the corporate defendants and the relative rights of purported owners to be defined by Delaware law. Further, it is not at all clear how a court might grant Whitney the relief he seeks without addressing matters of Delaware law. As such, the application of Delaware law represents the simpler (and, potentially, the only feasible) judicial task and appears to best honor the expectations of the parties to the alleged transaction involving the creation, ownership, and rights related to Delaware corporations.

Importantly, this case is not like a personal injury or other tort case involving an unexpected accident. Rather, it involves allegations of promises or agreements concerning the ownership of corporations. In accidental tort cases, the predictability-of-results factor carries little weight because the parties in such cases are not alleged to have acted in reliance on any state's laws. See Nesladek v. Ford Motor Co., 46 F.3d 734, 738 (8th Cir. 1995) (discounting this factor in an accident case because "[b]y definition, accidents are unplanned"). Here, instead, the facts alleged suggest precisely the type of situation where predictability concerns should be given substantial weight: purported financial transactions concerning the ownership, creation, or transfer of corporate entities and rights pursuant to such ownership. See Schoffman v. Cent. States Diversified, Inc., 69 F.3d 215, 219 n.10 (8th Cir. 1995) (applying Minnesota's conflict-of-law analysis and stating, "Predictability of results is of great importance in the contractual field . . . .")

Finally, the remaining two factors do not outweigh "the predictability of results" factor in this contract action. "Maintenance of interstate and international order . . . [is] primarily concerned with whether the application of [one state's] law would manifest disrespect for [another state's] sovereignty or impede the interstate movement of people and goods." Jepson, 513 N.W.2d at 470–71. And the factor "advancement of the forum's governmental interest" is concerned "that Minnesota

courts not be called upon to determine issues under rules . . . inconsistent with [Minnesota's] concept of fairness and equity." Hime v. State Farm Fire & Cas. Co., 284 N.W.2d 829, 833 (Minn. 1979). Nothing about the present allegations suggests that these factors require a court to apply Minnesota law. Rather, we believe it would be disruptive to interstate order if a party advancing a contract claim could enter into a purported contract leaving detailed rights and obligations to be defined by state law and then avoid application of that same state's law by selecting another forum.

Further, Minnesota has, by statute, clearly demonstrated that it does not have a strong governmental interest in applying its own statutes of limitations. Minnesota adopted the Uniform Conflict of Laws–Limitations Act, which calls for use of the statute of limitations from the state whose substantive law otherwise applies, Minn. Stat. Ann. § 541.31 subd. 1 (a)(1), unless that other state's "limitation period . . . is substantially different . . . and has not afforded a fair opportunity to sue upon, or imposes an unfair burden in defending against . . . ." Id. § 541.33. By calling for use of the statute of limitations from the state whose substantive law otherwise governs a claim and providing an "unfairness" exception to this general rule, Minnesota has expressed its governmental interest in terms of fairness rather than expressing a strong preference for home-rule as to periods of limitations.

Finally, the unfairness exception of section 531.33—a clear expression of Minnesota's "government interest"—does not apply in the present case. The comments to the uniform law make clear that the unfairness exception quoted from section 541.33 is "rarely [to] be employed" in "extreme cases." Uniform Conflict of Laws–Limitations Act § 4 cmts. (Main Volume 2008).[7] Because there is nothing

---

[7]The comment in full states:

This section provides an "escape clause" that will enable a court, in extreme cases, to do openly what has sometimes been done by indirection, to avoid injustice in particular cases. The "strong public

-10-

unfair or unreasonable about a three-year statute of limitations, as contrasted with a six year statute of limitations for oral contracts, the exception of section 541.33 does not apply. As such, in applying the <u>Jepson</u> choice of law factor concerning Minnesota's governmental interests, the Limitation Act actually supports the application of the Delaware law.

Based on these factors, we agree with the district court that Delaware law applies and that the contract claims are untimely pursuant to the Delaware statute of limitations.

B.    Claim Grouping/Claim Characterization

Whitney does not contend that his declaratory judgment claim differs materially from his contract claims. He argues, however, that his tort claims assert fraud and misrepresentations with elements that necessarily differ from the elements of his contract claims. He concludes the tort claims should not have been dismissed as redundant with the contract claims, and he argues the district court should have conducted a separate choice-of-law analysis for his tort claims.

---

policy" of a forum state can be effectuated. The section should rarely be employed, but will be useful if harsh results should in any case ensue from rigid application of the preceding sections. One illustrative possibility is noted in the Comment following Section 3, above.

Litigants will not often be able to take advantage of the "escape clause." It is not enough that the forum state's limitation period is different from that of the state whose substantive law is governing; the difference must be "substantial," and the "fair opportunity" provision constitutes a separate and additional requirement. An "escape clause" is needed, but it is not designed to afford an "easy escape".

-11-

We believe Whitney focuses his arguments too narrowly on differences in the elements of his tort and contract claims. In doing so, he fails to acknowledge the critical point that, for purposes of applying Minnesota's choice-of-law analysis in this case, nothing about his tort claims demands a result different from the result discussed above. Even if not wholly redundant or duplicative of his contract claims, the pseudo-contractual tort claims are subject to the same three-year Delaware statute of limitations, and are subject to dismissal for this reason.[8]

His tort claims rest upon the same alleged representations or agreements that lie at the heart of his contract claims. Even though different and additional elements would be involved in proof of the tort claims (*e.g.*, fraudulent intent), the same core issues and same core questions lie at the heart of his tort and contract claims—examination of the parties' promises and expectations as well as their performances or failures to perform after making such promises. Just like the contract claims discussed above, the pseudo-contractual tort claims Whitney alleges against

---

[8] The district court concluded that the tort claims were redundant with, or duplicative of, the contract claims and dismissed the tort claims on this substantive basis. We are skeptical that the issue is as simple as suggested below due to the permissibility of pleading in the alternative and the possibility of dealing with claim redundancy at the remedies stage rather than at the preliminary stage, as in this case. See, e.g., Wild v. Rarig, 234 N.W.2d 775, 789–90 (Minn. 1975) ("[W]hen a plaintiff seeks to recover damages for an alleged breach of contract *he is limited to damages* flowing only from such breach except in exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort." (emphasis added)). For the reasons discussed above, however, we conclude dismissal of the tort claims was required not because they were impermissibly redundant with the contract claims, but because the similarity between the claims requires the application of Delaware law, and the tort claims were, therefore, untimely. As with the contract claims, Delaware's statute of limitations for tort claims is three years, and Minnesota's is six. Del. Code Ann. tit. 10 § 8106(a); Minn. Stat. § 541.05 subd. 1 (5) & (6). And as with the contract claims, we find no unfairness that would require the application of Minnesota law.

-12-

the corporate defendants (and against Morrison concerning the corporate defendants) simply cannot be addressed in a legal void and without reference to Delaware law. On the narrow facts of the present case, Whitney has not explained how a court might assess the tort claims without examining the duties, rights, and ownership interests under Delaware law that form the heart of the contract claims. These rights, duties, and interests provide the detail of what the defendants allegedly promised to Whitney but failed to deliver. Because the choice-of-law analysis remains unchanged, then, dismissal of these pseudo-contractual tort claims was proper pursuant to the Delaware statute of limitations.

Whitney also argues it was error to group his unjust-enrichment claim with his contract claims as a quasi-contract claim because, regardless of whether he has a viable contract claim, he has asserted—as factual matter—that he paid $175,000 and received nothing in return. The only distinction we find potentially material in this context, however, is a technicality based upon the equitable nature of the unjust-enrichment claim as contrasted with the legal nature of the contract claim. This distinction, however, does not influence the outcome of the choice-of-law analysis.

In Delaware, no statute of limitations directly controls for determining the timeliness of an unjust-enrichment claim pleaded in equity. Rather, the doctrine of laches controls. Delaware courts, however, look to the three-year statute of limitations contained in Del. Code Ann. tit. 10 § 8106(a) when analyzing the application of laches to unjust-enrichment claims. See U.S. Virgin Islands v. Goldman, Sachs & Co., 937 A.2d 760, 807 (Del. Ch. 2007) (using Delaware's three-year statute of limitations for oral contracts to guide application of a laches defense). We find no Delaware authority nor any pertinent allegations suggesting a different time frame might be relevant to the current dispute. Similarly, Minnesota's six-year limitations period generally governs unjust-enrichment claims in that state. Block v. Litchy, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988) ("The applicable time limit for bringing an action in unjust enrichment is six years."). As such, a conflict still exists

-13-

between the two states' laws. Beyond this technical distinction, the choice-of-law analysis for the unjust-enrichment claim in the present case mirrors that of the contract claim. We therefore find no error in the district court's dismissal of the unjust enrichment claim.

C.     Shareholder Claims

The shareholder claims stand alone in the present case in that the parties agree Delaware law controls. The parties disagree, however, as to whether Whitney's admittedly minimal pleadings meet the requirements of Twombly. The district court held the shareholder claims did not satisfy Twombly and dismissed the claims without prejudice. We hold Whitney's pleadings were minimally sufficient to present a plausible claim.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). We assess plausibility considering only the materials that are "necessarily embraced by the pleadings and exhibits attached to the complaint," Mattes v. ABC Plastics, Inc., 323 F.3d 695, 697 n.4 (8th Cir. 2003), and "draw[ing] on [our own] judicial experience and common sense." Iqbal, 556 U.S. at 679. Further, we "review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." Zoltek Corp. v. Structural Polymer Grp., 592 F.3d 893, 896 n.4 (8th Cir. 2010)

-14-

The defendants argue that Whitney's claims are implausible largely for three reasons. First, Whitney presented no documentation of his ownership—no stock certificates or other records of his ownership of shares such as corporate records or state filings showing him as an owner or purchaser of shares. Second, his allegations are implausible and fail "the sniff test" simply because, as a practical matter, no investor would pay $175,000 for ownership in several corporations and wait five years to demand evidence of, or benefits from, that ownership. And third, Whitney has failed to articulate clearly whether he actually alleges that he is an owner of the defendant corporations or whether he has been deprived of ownership. We believe all three of these arguments miss the mark.

First, documentary evidence generally is not required at the pleading stage. Were we reviewing a grant of summary judgment after development of the record pursuant to the evidentiary requirements of Rule 56, arguments based on the absence of evidence would bear consideration. We refuse, however, to incorporate some general and formal level of evidentiary proof into the "plausibility" requirement of Iqbal and Twombly. In fact, one of the concerns of Twombly was the need to balance the burdensome costs of discovery against the relatively loose and light pleading requirements of Fed. R. Civ. Pro. 8, and Twombly did not address this concern by requiring evidence at the pleading stage. See Twombly, 550 U.S. at 559 (discussing the need "to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a . . . claim" (internal quotation marks and citation omitted)); Iqbal, 556 U.S. 678–79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). The question for us to address at this preliminary stage is not whether Whitney might at some later stage be able to prove his ownership; the question is whether he has adequately asserted facts (as contrasted with naked legal conclusions) to support his claims. Evidence is not required because "on a motion to dismiss, inferences are to be drawn in favor of the non-moving party.

Twombly and Iqbal did not change this fundamental tenet . . . ." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 595 (8th Cir. 2009) (internal citation omitted).

Even if it might be permissible in some limited circumstances to demand documentation for purposes of assessing the plausibility of a claim, it is not appropriate to demand such proof in this case. Here, the custodians of the relevant corporate records seemingly must be the defendants themselves or their agents. In this circumstance, where the defendants may well possess the very documents the plaintiff needs to prove the alleged ownership, it would be odd to demand such documents from the plaintiff before discovery. Id. at 598 (identifying the practical difficulties inherent in situations where the "crucial information . . . tend[s] systematically to be in the sole possession of the defendants"); see also In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig., 623 F.3d 1200, 1211–12 (8th Cir. 2010) (Melloy, J., dissenting in part) (discussing the application of Twombly in cases involving information in the possession of defendants). This is especially true where (1) one of the plaintiff's allegations is the denial of access to such materials, (2) the plaintiff has alleged the fact of the payment of specific sums on specific days for specific purposes, (3) the plaintiff has alleged contemporaneous formation of one of the corporate defendants, and (4) the defendants have not yet been called upon to admit or deny the fact of such payments.

Second, we believe that arguments regarding timeliness concerns are generally better left for assessment under statutes of limitations or the doctrine of laches. We do not purport to hold that timing is wholly irrelevant to the plausibility analysis; we simply find no authority for formally importing such timeliness concerns into the Twombly plausibility standard. We also find nothing about the timing in the present case to be so implausible as to fail at this initial stage.

The facts of each unique case will dictate whether the timing of a demand or complaint substantially detracts from the plausibility of a claim. Defendants' timing-

related argument appears to be as follows: a $175,000 investment is so large that no investor would have contributed such an astounding sum and then sat by idly for five years without raising concerns. Implicit in such an argument, however, is a value judgment or assumption concerning the relative value of that particular investment to Whitney and concerning his trust of Morrison. It is not appropriate to assess plausibility based upon such assumptions.

Different individuals, particularly individuals of different means, track their investments with varying degrees of care. We do not believe plausibility should be measured with reference to what a particular attorney or judge deems to be subjectively reasonable behavior. What is an unusually large investment to one person may be pedestrian to another. Similarly, what passes for diligence varies from person to person, and also varies from investment to investment depending on the relationship between the investor and recipient of funds. "[C]ommon sense," Iqbal, 556 U.S. at 679, requires that we maintain an objective, rather than a highly subjective, view of plausibility and reasonableness. In other words, "plausible" means plausible and that is all we are to assess. We do not sit as jurors who must accept or reject Whitney's assertions. We ask only whether reasonable jurors could find the allegations plausible.

It is at least plausible that Whitney trusted Morrison and the corporate defendants sufficiently to invest $175,000 without keeping close tabs on his investment. Whitney has alleged the facts that several of the corporate defendants were tenants in a Minnesota property that Whitney owns. He also alleged that he followed his initial payment of $150,000 with the later $25,000 infusion of capital for one of the corporate defendants. He also alleged that his initial $150,000 payment was contemporaneous with the formation of The Guys, Inc. Based upon these alleged pre-existing relationships with Morrison and at least some of the defendants and the ongoing relationship as shown by the follow-up capital infusion and the landlord-tenant relationship, it would not be unreasonable to conclude that, for some period

-17-

of time following the initial payment, Whitney and the defendants conducted their affairs informally. Simply put, personal investments are not always conducted with the care and precision of regulated banks. Although this lack of care may ultimately be fatal to Whitney's ability to prove his claims, it does not make them implausible. See Twombly, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (citation and internal quotation marks omitted)).

Finally, and perhaps most importantly, we believe the defendant's plausibility arguments fail to acknowledge the importance of allowing plaintiffs to plead in the alternative. Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); Elena v. San Juan, 677 F.3d 1, 8 n.10 (1st Cir. 2012) (holding that an alternative allegation of an ownership interest was plausible); Brown v. Cassens Transp. Co., 675 F.3d 946, 968–69 (6th Cir. 2012) (holding an alternative pleading plausible). In our view, Whitney did not make his complaint any more or less plausible by electing to plead in the alternative that (1) he was denied ownership, and (2) he actually is an owner of the corporate defendants but is being denied proof and benefits of that ownership. Because Whitney has alleged plausible shareholder claims, he should be allowed to pursue these claims into the evidentiary phases of litigation.

We affirm the district court's judgment regarding the choice of law and dismissal of claims pursuant to the Delaware statute of limitations but reverse as to the shareholder claims and remand for further proceedings.

_____