PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3491
_____

ELLIOTT J. SCHUCHARDT,
individually and doing business as the Schuchardt Law Firm,
on behalf of himself and all others similarly situated,
                                                    Appellant

v.

PRESIDENT OF THE UNITED STATES;
DIRECTOR OF NATIONAL INTELLIGENCE;
DIRECTOR OF THE NATIONAL SECURITY AGENCY
AND CHIEF OF THE CENTRAL SECURITY SERVICE;
DIRECTOR OF THE FEDERAL BUREAU OF
INVESTIGATION
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(W.D. Pa. No. 2-14-cv-00705)
District Judge: Honorable Cathy Bissoon
_____

Argued: May 17, 2016

Before: *SMITH, *Chief Judge*, HARDIMAN, and
NYGAARD, *Circuit Judges*.

(Filed: October 5, 2016)

Elliot J. Schuchardt    [Argued]
309 Braeburn Drive
Winchester, VA 22601
        *Counsel for Appellant*

Andrew G. Crocker, Esq.
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
        *Counsel for Amicus Appellant*

Benjamin C. Mizer
David J. Hickton
H. Thomas Byron III
Henry C. Whitaker    [Argued]
United States Department of Justice
Appellate Section, Room 7256
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
        *Counsel for Appellee*

---

* Honorabel D. Brooks Smith, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on October 1, 2016

———————

OPINION

———————

HARDIMAN, *Circuit Judge*.

This appeal involves a constitutional challenge to an electronic surveillance program operated by the National Security Agency (NSA) under the authority of Section 702 of the Foreign Intelligence Surveillance Act (FISA). Elliott Schuchardt appeals an order of the United States District Court for the Western District of Pennsylvania dismissing his civil action for lack of jurisdiction. The District Court held that Schuchardt lacked standing to sue because he failed to plead facts from which one might reasonably infer that his own communications had been seized by the federal government. Because we hold that, at least as a facial matter, Schuchardt's second amended complaint plausibly stated an injury in fact personal to him, we will vacate the District Court's order and remand.

I

Schuchardt's appeal is the latest in a line of cases raising the question of a plaintiff's standing to challenge surveillance authorized by Section 702. Congress amended FISA in 2008 to "supplement[] pre-existing FISA authority by creating a new framework under which the Government may . . . target[] the communications of non-U.S. persons located abroad." *Clapper v. Amnesty International USA*, 133 S. Ct. 1138, 1144 (2013); *see also* FISA Amendments Act of 2008, Pub. L. No. 110–261, 122 Stat. 2436, 2438, 50 U.S.C.

§ 1881a. On the day Section 702 became law, its constitutionality was challenged by "attorneys and human rights, labor, legal, and media organizations whose work allegedly require[d] them to engage in . . . telephone and e-mail communications" with persons located outside the United States. *See id.* at 1145. The *Clapper* plaintiffs claimed that Section 702 was facially unconstitutional under the Fourth Amendment, which prohibits unreasonable searches and seizures. *See id.* at 1146.

A

The dispositive question presented to the Supreme Court in *Clapper* was whether the plaintiffs had established an "imminent" injury "fairly traceable" to the government's conduct under Section 702. *See* 133 S. Ct. at 1147. Because the plaintiffs had brought suit on the day the law was enacted, there was no evidence that their communications had been intercepted—there was only a looming "threat of [future] surveillance." *Id.* at 1145–46. Nonetheless, the plaintiffs claimed they had standing because there was an "objectively reasonable likelihood" that their communications would be intercepted based on the nature of their contacts with persons outside of the country. *Id* at 1146.

The Supreme Court rejected this argument as "inconsistent" with longstanding precedent requiring that "threatened injury must be *certainly impending* to constitute injury in fact," *Clapper*, 133 S. Ct. at 1147 (emphasis in original) (quoting *Whitmore v. Arkansas*, 495 U.S 149, 158 (1990)). And because the plaintiffs could rely only on a "speculative chain of possibilities" to support their allegations of future harm from unlawful government surveillance, they

4

failed to demonstrate an injury that was "certainly impending." *Id*. at 1150.

In particular, the Court characterized the *Clapper* plaintiffs' "speculative chain" as entailing five inferential leaps:

> (1) the Government will decide to target the communications of non-U.S. persons with whom [the plaintiffs] communicate;

> (2) in doing so, the Government will choose to invoke its authority under [Section 702] rather than . . . another method of surveillance;

> (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures . . . satisfy [Section 702's] many safeguards and are consistent with the Fourth Amendment;

> (4) the Government will succeed in intercepting the communications of [the plaintiffs'] contacts; and

> (5) [the plaintiffs] will be parties to the particular communications that the Government intercepts.

133 S. Ct. at 1148.

On summary judgment, the plaintiffs had failed to "set forth by affidavit or other evidence specific facts" supporting these inferences. *Id*. at 1149 (internal quotation marks

omitted). Accordingly, they lacked standing to challenge the constitutionality of Section 702. *Id.*

B

Soon after *Clapper* was decided, former NSA contractor Edward Snowden leaked a trove of classified documents to journalists writing for the *Washington Post* and *Guardian*.[1] Those documents referenced the existence of an NSA program engaged in the bulk collection of domestic telephone metadata, *i.e.*, "details about telephone calls, including for example, the length of a call, the phone number from which the call was made, and the phone number called," but not the voice content of the call itself. *ACLU v. Clapper*, 785 F.3d 787, 793 (2d Cir. 2015); *see also Smith v. Obama*, 816 F.3d 1239, 1241 (9th Cir. 2016); *Obama v. Klayman*, 800 F.3d 559, 561 (D.C. Cir. 2015). The operational parameters of the program were summarized in a classified order of the Foreign Intelligence Surveillance Court (FISC) directed at Verizon Business Network Services. *ACLU*, 785 F.3d at 795. In short, based on Section 215 of the USA PATRIOT Act, Pub. L. No. 107–56, 115 Stat. 272, 287 (2001) (codified as amended at 50 U.S.C. § 1861 *et seq.*), Verizon was producing to the government, "all call detail records or 'telephony metadata' . . . on *all* telephone calls made through its systems

---

[1] *See, e.g.*, Ellen Nakashima, *Verizon Providing All Call Records to U.S. Under Court Order*, Wash. Post (June 6, 2013), https://perma.cc/LZK7-37CJ; *see also* Glenn Greenwald, *NSA Collecting Phone Records of Millions of Verizon Customers Daily*, Guardian (June 6, 2013), https://perma.cc/UR2A-492H.

or using its services where one or both ends of the call are located in the United States." *ACLU*, 785 F.3d at 795.

The government's bulk collection of telephone metadata precipitated a number of lawsuits. In one case, the Second Circuit held that the government had exceeded its statutory authority under Section 215 to obtain "relevant" information by constructing an "all-encompassing" database of "every telephone call made or received in the United States." *ACLU*, 785 F.3d at 812–13. Under the statute's sunset provision, however, authorization for the bulk telephone metadata collection program expired on June 1, 2015. *See* Pub. L. No. 112–14, 125 Stat. 216 (2011) (authorizing an extension); *Smith*, 816 F.3d at 1241. And although the program was subsequently reauthorized by the USA FREEDOM Act, Pub. L. No. 114–23, 129 Stat. 268 (2015), that act "prohibits any further bulk collection." *Smith*, 816 F.3d at 1241. In reliance on that prohibition, the Ninth Circuit has determined that "claims related to the ongoing collection of metadata [under Section 215] are [now] moot." *Id.*

Separate and apart from the bulk collection of telephone metadata under Section 215, the documents leaked to the *Washington Post* and *Guardian* also shed light on a previously undisclosed electronic surveillance program operating under Section 702 called PRISM.[2] Slides from a

---

[2] *See, e.g.*, Barton Gellman & Laura Poitras, *U.S. British Intelligence Mining Data from Nine U.S. Internet Companies in Broad Secret Program*, Wash. Post (June 7, 2013), https://perma.cc/YJU2-U9TZ; Glenn Greenwald & Ewan MacAskill, *NSA Prism Program Taps in to User Data*

7

presentation purportedly authored by the NSA described PRISM as "collect[ing] directly from the servers" the full content of user communications exchanged using services provided by several large U.S. companies—including Microsoft, Google, Yahoo, Apple, and Facebook. App. 53. Another slide depicted a timeline showing the inception of PRISM collection from each company, beginning with Microsoft in September 2007 and ending with Apple in October 2012. Yet another slide suggested a slogan for the NSA's "New Collection Posture": "Sniff it All, Know it All, Collect it All, Process it All, Exploit it All, and Partner it All." App. 61.

II

On June 2, 2014, Schuchardt filed a complaint in the District Court asserting constitutional, statutory, and state law claims against the President, the Director of National Intelligence, and the Directors of the NSA and Federal Bureau of Investigation. He alleged that the Government was violating the Fourth Amendment by storing his confidential communications "in a computer database, or through a government program, which the Defendants call 'Prism.'" Civil Complaint ¶ 22, *Schuchardt v. Obama*, No. 2-14-cv-00705-CB (W.D. Pa. June 2, 2014), ECF No. 1. He sought to enjoin "the [Government] from engaging in any further collection of . . . [his] information." *Id.* ¶ 37.

Schuchardt responded to the Government's successive motions to dismiss by amending his complaint twice. In

_of Apple, Google and Others_, Guardian (June 7, 2013), https://perma.cc/RPA9-RXSY

addition to refining and expanding his allegations, Schuchardt supplemented his averments with exhibits, the contents of which fall into two general categories. First, he supported his allegations regarding PRISM with excerpts of the classified materials that were the focus of the *Washington Post* and *Guardian* reports, as well as several of the reports themselves. Second, he included affidavits filed in support of the plaintiffs in *Jewel v. NSA* (*Jewel I*), 965 F. Supp. 2d 1090 (N.D. Cal. 2013), a case challenging the NSA's interception of internet traffic flowing through a telecommunications facility in San Francisco pursuant to an Executive Order issued shortly after September 11, 2001. *Id.* at 1098. *Jewel I* was decided on remand from *Jewel v. NSA*, 673 F.3d 902 (9th Cir. 2011), in which the Ninth Circuit held that the plaintiffs had adequately pleaded Article III standing to sue. *See* 673 F.3d at 913. The affidavits in *Jewel I* were filed by former NSA employees who asserted that the agency had, since September 11, developed an expansive view of its own surveillance authority and the technology to back it up. *See, e.g.*, App. 126 ("The post-September 11 approach was that NSA could circumvent federal statutes and the Constitution as long as there was some visceral connection to looking for terrorists. . . . [The NSA] has, or is in the process of obtaining, the capability to seize and store most electronic communications passing through its U.S. intercept centers.").[3]

---

[3] Schuchardt's second amended complaint also asserted: a Fourth Amendment claim challenging the bulk collection of telephone metadata under Section 215, App. 99 (Count II); a Pennsylvania state-law claim, App. 100 (Count III), and a First Amendment claim, App. 101 (Count IV), challenging both PRISM and the telephone metadata

Based on the record he had compiled, Schuchardt's second amended complaint alleged that because the Government was "intercepting, monitoring and storing the content of *all or substantially all* of the e-mail sent by American citizens," his own online communications had been seized in the dragnet. App. 82, 95–99 (emphasis added). In particular, Schuchardt asserted that he was "a consumer of various types of electronic communication, storage, and internet services," including "the e-mail services provided by Google and Yahoo; the internet search services of Google; the cloud storage services provided by Google and Dropbox; [and] the e-mail and instant message services provided by Facebook." App. 95–96. Then, relying on the operational details of PRISM made public by the *Washington Post* and *Guardian*, he alleged that: (1) the Government "had obtained direct access to the servers" of the companies providing him

---

program; and statutory claims under FISA seeking injunctive relief, App. 103 (Count V), and damages, App. 104 (Count VI). At oral argument, Schuchardt belatedly conceded that his claims regarding the bulk collection of telephone metadata were mooted by the USA FREEDOM Act. *See* Transcript of Oral Argument at 5, *Schuchardt v. Obama*, No. 15-3491 (3d Cir. May 17, 2016). He also agreed that his claim for monetary damages under FISA was barred by the doctrine of sovereign immunity, and that he was no longer pursuing his claims under the First Amendment. *Id.* at 10–11. In light of Schuchardt's concessions, we do not address these issues, and focus solely on whether he has standing to litigate his Fourth Amendment claim for injunctive relief based on the Government's alleged bulk collection of online communications under PRISM, App. 95 (Count I).

with these services; (2) the Government was "unlawfully intercepting, accessing, monitoring and/or storing [his] private communications . . . made or stored through such services"; and (3) the Government was "collecting such information in order to 'data mine' the nation's e-mail database." App. 84, 95–97.

In its motion to dismiss Schuchardt's second amended complaint, the Government principally took issue with his allegation that the "NSA collects the online communications . . . of *all* Americans, including, therefore, his." *See* Brief in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint at 2, *Schuchardt v. Obama*, No. 2-14-cv-00705-CB (W.D. Pa. Dec. 11, 2014), ECF No. 21 (emphasis added). Specifically, the Government argued that because Section 702 authorizes the targeted surveillance of only persons outside the United States, it was implausible that PRISM—a program operating under the authority of Section 702—was a dragnet capturing all the country's domestic online communications. In support of its position, the Government cited a report on PRISM prepared by the Privacy and Civil Liberties Oversight Board (PCLOB),[4] an independent agency tasked with "review[ing] actions the executive branch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties." 42 U.S.C. § 2000ee(c)(1). Based on its review, the PCLOB determined

---

[4] Privacy & Civil Liberties Oversight Board, Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act (July 2, 2014), *available at* https://www.pclob.gov/library/702-Report.pdf [hereinafter PCLOB Report].

that "[i]n PRISM collection, the government . . . sends selectors—such as an email address—to a United States-based electronic communications service provider," who is then by law "compelled to give the communications sent to or from that selector to the government." PCLOB Report at 33. Far from being the dragnet that Schuchardt had alleged, therefore, "PRISM collection under Section 702 may be targeted only at non-U.S. persons located abroad who possess or are likely to receive foreign-intelligence information." Brief in Support of Defendants' Motion to Dismiss at 10, *Schuchardt v. Obama*, No. 2-14-cv-00705-CB (W.D. Pa. Aug. 11, 2014), ECF No. 8. Because none of Schuchardt's allegations suggested that he or his associates would be targeted as such persons, the Government argued that he had failed to include "well-pleaded allegations and non-conclusory allegations of fact" necessary to establish his standing. Brief in Support of Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint at 4, *Schuchardt v. Obama*, No. 2-14-cv-00705-CB (W.D. Pa. Dec. 11, 2014), ECF No. 21.

The District Court granted the Government's motion to dismiss Schuchardt's second amended complaint, but took a slightly different tack than what the Government had suggested. After considering four cases examining constitutional standing to sue in cases challenging national security surveillance—*Clapper*, *ACLU*, *Jewel*, and *Klayman*—the Court deduced a "meaningful distinction" that explained their divergent outcomes. *Schuchardt v. Obama*, 2015 WL 5732117, at *6 (W.D. Pa. Sept. 30, 2015). "In situations where plaintiffs are able to allege with some degree of particularity that their own communications were specifically targeted—for example by citing a leaked FISC

12

order or relying on a detailed insider account—courts have concluded that the particularity requirement has been satisfied." *Id*. "On the other hand, courts have refused to find standing based on naked averments that an individual's communications must have been seized because the government operates a data collection program and the individual utilized the service of a large telecommunications company." *Id*.

Applying the pleading standard it had gleaned from *Clapper*, *ACLU*, *Jewel*, and *Klayman*, the District Court began by noting that the facts underpinning Schuchardt's allegations were drawn almost entirely from "media reports and publicly available information." *Id*. Accordingly, his lawsuit fell "squarely within the second category" of cases, *i.e.*, those brought by plaintiffs who lacked Article III standing. *Id*. Furthermore, Schuchardt "had identified no facts from which the Court reasonably might infer that his own communications have been targeted, seized, or stored." *Id*. As such, he was "indistinguishable from every other American subscribing to the services of a major telephone and/or internet service provider." *Id*. His "only discernible distinction [was] his heightened personal-interest in the subject," which was "insufficient to confer standing." *Id*. (citing *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220 (1974)).

III

The District Court had jurisdiction over Schuchardt's claims under 28 U.S.C. § 1331, as well as the inherent power to ascertain its own jurisdiction. *See Arbaugh v. Y. & H. Corp.*, 546 U.S. 500, 514 (2006). We have jurisdiction under 28 U.S.C. § 1291. *See also Bender v. Williamsport Area Sch.*

13

*Dist.*, 475 U.S. 534, 541–42 (1986). We review de novo the District Court's order dismissing Schuchardt's second amended complaint. *See Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

At the outset, we note that there is an important distinction between "facial" and "factual" attacks on subject matter jurisdiction raised in a motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See Mortensen v. First Fed. Sav. & Loan*, 549 F.2d 884, 891 (3d Cir. 1977). In a facial attack, we review only "the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). If, however, the defendant contests the pleaded jurisdictional facts, "the court must permit the plaintiff to respond with evidence supporting jurisdiction." *Id.* at 177 (citing *Int'l Ass'n of Machinists & Aerospace Workers v. Nw. Airlines, Inc.*, 673 F.2d 700, 711–12 (3d Cir. 1982)). "The court may then determine jurisdiction by weighing the evidence presented by the parties," but "if there is a dispute of a material fact, the court must conduct a plenary trial on the contested facts prior to making a jurisdictional determination." *Id.*

It is clear from the record in this case that the District Court viewed the Government's motion to dismiss as a facial attack on its jurisdiction. The Court's analysis focused solely on Schuchardt's second amended complaint; it did not consider any extrinsic facts proffered by the Government, including, for example, the nature of PRISM collection as determined by the PCLOB. *See Schuchardt*, 2015 WL 5732117, at *5–7. Accordingly, our review of the District

14

Court's order will accept as true all of Schuchardt's plausible allegations, and draw all reasonable inferences in his favor.[5]

IV

We begin our analysis with first principles. As a plaintiff seeking to invoke federal jurisdiction, Schuchardt bears the burden of establishing each element of his standing to sue under Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[T]he irreducible constitutional minimum of standing contains three elements." *Id*. at 560.

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely

---

[5] Schuchardt has also challenged on appeal the District Court's order denying his request for a preliminary injunction, a decision the Court rendered more than six months before granting the Government's motion to dismiss. Because Schuchardt failed to identify that unrelated order in his notice of appeal, however, we lack jurisdiction to consider his arguments. *See Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 184 (3d Cir. 2010).

15

> speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560–61 (internal quotation marks, citations, and alterations omitted).

Because a motion to dismiss raising a facial attack on subject matter jurisdiction relies solely on the pleadings, "we apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim." *See Finkelman v. NFL*, 810 F.3d 187, 194 (3d Cir. 2016). "Thus, to survive a motion to dismiss for lack of standing, a plaintiff must allege facts that affirmatively and plausibly suggest that [he] has standing to sue." *Id.* (internal quotation marks omitted). That is, the plaintiff must "plausibly allege facts establishing each constitutional requirement." *Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Against this doctrinal backdrop, Schuchardt's Article III standing turns on two inquiries. First, were his allegations sufficiently "particularized" to demonstrate that he suffered a discrete injury? *See Lujan*, 504 U.S. at 560. Second, were those facts pleaded with enough detail to render them plausible, "well-pleaded" allegations entitled to a presumption of truth? *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). We address each inquiry in turn.

A

A "particularized" Article III injury is one that "affect[s] the plaintiff in a personal and individual way." *In re Schering Plough Corp. Intron/Temodar Consumer Class*

*Action*, 678 F.3d 235, 245 (3d Cir. 2012) (quoting *Lujan*, 504 U.S. at 560 n.1). That putative litigants must suffer in some discrete and personal fashion ensures, first, that "the legal questions presented . . . will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," and, second, that our "exercise of judicial power" shows "[p]roper regard for the . . . other two coequal branches of the Federal Government." *Valley Forge Christian Coll. v. Ams. United for the Separation of Church & State, Inc.*, 454 U.S. 464, 471–74 (1982). These two concerns—respect for the judicial role and separation of powers—are most salient when courts are asked "to review actions of the political branches in the fields of intelligence gathering and foreign affairs." *Clapper*, 133 S. Ct. at 1147.

The Supreme Court has identified a subset of cases in which plaintiffs routinely fail to demonstrate particularized injury because they present only "generalized grievances," *i.e.,* injuries that are "undifferentiated and 'common to all members of the public.'" *Lujan*, 504 U.S. at 573–74 (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)). "Whether styled as a constitutional or prudential limit on standing, the Court has sometimes determined that where large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23 (1998). Such cases often involve government action directed at the public at large, or harms that by their nature touch upon interests that are widely shared. *See, e.g.*, *Schlesinger*, 418 U.S. at 217 (plaintiffs asserting violation of the Incompatibility Clause by members of Congress also

17

serving in the armed reserves lacked standing because their only interest was "to have the Judicial Branch compel the Executive Branch to act in conformity with the [law] . . . an interest shared by all citizens"); *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972) (association challenging development of national park lacked standing based on alleged "special interest" in conservation).

Nevertheless, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo*, 136 S. Ct. at 1548 n.7. "The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Id.*; *see also Massachusetts v. EPA*, 549 U.S. 497, 526 n.24 (2007) ("[S]tanding is not to be denied simply because many people suffer the same injury. . . . To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody."). And although particularity and concreteness are distinct elements constituting injury in fact, *see Spokeo*, 136 S. Ct. at 1545, the Supreme Court has also observed that the "judicial language" accompanying generalized grievances "invariably appears in cases where the harm is not only widely shared, *but also of an abstract or indefinite nature*—for example, harm to the 'common concern for obedience to law.'" *Akins*, 524 U.S. at 23 (emphasis added).

We applied these principles in a recent case involving allegations of government surveillance. In *Hassan v. City of New York*, the plaintiffs claimed that the New York City Police Department (NYPD) had implemented a program "to monitor the lives of Muslims, their businesses, houses of

18

worship, organizations, and schools." 804 F.3d at 285. The program allegedly entailed "widespread" photo and video surveillance of "organizations and businesses . . . visibly or openly affiliated with Islam," and the infiltration of "Muslim-affiliated" groups with informants and undercover police officers. *Id.* at 285–86. The information gathered was compiled into a series of reports "document[ing] . . . American Muslim life in painstaking detail." *Id.* (internal quotation marks omitted). The *Hassan* plaintiffs discovered the program after some of these reports became "widely publicized," and they asserted that the fallout required them to alter their ordinary day-to-day conduct. *See id.* at 287–88.

We held that the plaintiffs' allegations in *Hassan* were sufficient to demonstrate particularized injury under Article III. After determining that they had asserted "an invasion of a legally protected interest"—"[t]he indignity of being singled out [by the government] for special burdens on the basis of one's religious calling"—we observed that the particularized nature of an injury does not turn on the number of persons that may claim it. *Id.* at 289. "[T]hat hundreds or thousands (or even millions) of other persons may have suffered the same injury does not change the individualized nature of the asserted rights and interests at stake." *Id.* at 291 (citing *Akins*, 524 U.S. at 24). "Harm to all—even in the nuanced world of standing law—cannot be logically equated with harm to no one." *Id.* And with regard to allegations of widespread government surveillance, we stated that because the plaintiffs had "claim[ed] to be the very targets of the allegedly unconstitutional surveillance, they [were] unquestionably 'affect[ed] . . . in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).

Like the plaintiffs in *Hassan*, Schuchardt has alleged a program of government surveillance that, though universal in scope, is unmistakably personal in the purported harm. His second amended complaint describes PRISM as a dragnet that collects "all or substantially all of the e-mail sent by American citizens by means of several large internet service providers." App. 82. The collected information allegedly encompasses Schuchardt's personal communications, and includes not only the kind of intensely private details that one could reasonably expect to find in the email accounts of most Americans—"bank account numbers; credit card numbers; passwords for financial data; [and] health records"—but also data influenced by Schuchardt's personal circumstances, namely "trade secrets" and "communications with clients of Schuchardt's law firm, which are privileged and confidential under applicable law." App. 96.

The Government strenuously disputes the plausibility of Schuchardt's assertion that PRISM collects "all or substantially all of the e-mail sent by American citizens," and we address that dispute in detail below. But putting aside for the moment the question of whether Schuchardt's allegations concerning PRISM are entitled to a presumption of truth, the consequences that he identifies as flowing from the Government's alleged dragnet are undoubtedly personal to him insofar as he has a constitutional right to maintain the privacy of his personal communications, online or otherwise. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) ("Fourth Amendment rights are personal rights . . . which may not be vicariously asserted." (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). That interest is neither indivisibly abstract nor indefinite, *see Warshak v. United States*, 631 F.3d 266, 288 (6th Cir. 2010), and the fact

that a large percentage of the population may share a similar interest "does not change [its] individualized nature" because Schuchardt's allegations make clear that he is among the persons that are the "very targets of the allegedly unconstitutional surveillance." *Hassan*, 804 F.3d at 291; *cf. Riley v. California*, 134 S. Ct. 2473, 2484–85 (2014) (extending the warrant requirement to searches of cellular phones, "which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy").

B

Having determined that Schuchardt's allegations stated a particularized injury under Article III, we now consider whether those allegations should be credited as true for the purpose of resolving the Government's jurisdictional objection. As noted previously, the District Court construed the Government's motion to dismiss as a facial attack on its subject matter jurisdiction. As a result, we must accept Schuchardt's allegations as true, with the important caveat that the presumption of truth attaches only to those allegations for which there is sufficient "factual matter" to render them "plausible on [their] face." *Iqbal*, 556 U.S. at 679. Conclusory assertions of fact and legal conclusions are not entitled to the same presumption. *See id.*; *see also Twombly*, 550 U.S. at 57; *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) ("Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must . . . identify allegations that, 'because they are no more

21

than conclusions, are not entitled to the assumption of truth.'" (quoting *Iqbal*, 556 U.S. at 679)).[6]

1

We have recognized that "[t]he plausibility determination is a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *See, e.g.*, *Connelly*, 809 F.3d at 786–87 (quoting *Iqbal*, 556 U.S. at 675). At the same time, we have cautioned that the plausibility standard does not impose a heightened pleading requirement, and that Federal Rule of Civil Procedure 8(a) continues to require only a "showing" that the pleader is entitled to relief. *See, e.g.*, *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233–34 (3d Cir. 2008) ("The [Supreme] Court emphasized . . . that it was neither demanding a heightened pleading of specifics nor imposing a probability requirement.")). Indeed, although *Twombly* and *Iqbal* emphasized the plaintiff's burden of pleading sufficient "factual matter," the Supreme Court also expressly

_____

[6] We have instructed courts to follow a three-step process to determine the sufficiency of a complaint in accordance with *Twombly* and *Iqbal*. "First, [the court] must take note of the elements the plaintiff must plead to state a claim. Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly*, 809 F.3d at 787 & n.4 (internal citations, quotations marks, and original modifications omitted).

"disavow[ed]" the requirement that a plaintiff plead "specific facts." *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008) (quoting *Twombly*, 550 U.S. at 569, and *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)).

Implicit in the notion that a plaintiff need not plead "specific facts" to survive a motion to dismiss is that courts cannot inject evidentiary issues into the plausibility determination.[7] *See Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."). This includes the weighing of facts or the requirement that a plaintiff plead "specific facts" beyond those necessary to state a valid claim. *See id.* at 573 n.8 ("[W]hen a complaint

---

[7] The "evidentiary issues" to which we refer are distinct from the question of what documents may be considered in resolving a motion to dismiss applying the standard of review under Rule 12(b)(6), or, as relevant here, addressing a facial challenge to subject matter jurisdiction under Rule 12(b)(1). The general rule for determining the scope of the pleadings in this scenario is that a district court "may consider *only* the allegations contained in the pleading[s] to determine [their] sufficiency," but is permitted to consider "document[s] *integral to or explicitly relied* upon in the complaint," and "any undisputedly authentic document that a defendant attaches . . . if the plaintiff's claims are based on the document," without converting the motion into one for summary judgment. *See In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 133 & n.7 (3d Cir. 2016) (internal citations and quotation marks omitted). *See generally* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1350 n.1 (3d ed. 2016).

adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder."). The same logic precludes a court from rejecting pleaded facts based on some blanket exclusion of evidence. *See Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991). "A contrary rule would confuse the principles applicable to a motion to dismiss with those governing a motion for summary judgment." *Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012); *see also Whitney v. Guys, Inc.*, 700 F.3d 1118, 1128–29 (8th Cir. 2012).

Accordingly, although it is unclear whether the District Court applied a heightened pleading standard in this case, to the extent that its opinion suggests that Schuchardt's reliance on "media reports and other publicly-available information" was impermissible, we disagree.[8] *See Schuchardt*, 2015 WL

---

[8] Despite *Clapper*'s observation that the standing inquiry is "especially rigorous" in matters touching on "intelligence gathering and foreign affairs," 133 S. Ct. at 1147, to our knowledge no court has imposed a heightened pleading standard for cases implicating national security. *See Jewel*, 673 F.3d at 913 ("Article III imposes no heightened standing requirement for the often difficult cases that involve constitutional claims against the executive involving surveillance."). In this appeal, we will assume without deciding that a heightened pleading standard does not apply. *See, e.g.*, *Jones v. Bock*, 549 U.S. 199, 212–13 (2007) (explaining that "courts should generally not depart from the usual practice under the Federal Rules on the basis of perceived policy concerns," including the imposition of a

5732117, at *6. Indeed, we held that the plaintiffs in *Hassan* had plausibly pleaded both their standing to sue and claims for relief based on NYPD surveillance reports that the plaintiffs had discovered only *after* they had been "widely publicized." *See* 804 F.3d at 287. Similarly, we take the District Court's enumeration of the types of evidence giving rise to the plaintiffs' standing in *Jewel* and *ACLU*—"a leaked FISC order or a detailed insider account"—as merely a suggestion of facts that would have strongly supported the plausibility of Schuchardt's allegations, rather than a requirement that he plead those specific facts. *See* 2015 WL 6732117, at *6. Such limitations on the scope or source of facts that a plaintiff may plead to reach the threshold of plausibility run counter to the longstanding principles animating pretrial dispositions, as set forth in *Twombly* and *Iqbal*, and come close to the weighing of evidence and credibility determinations that are the exclusive province of the factfinder. *See Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."); *Twombly*, 550 U.S. at 556 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The upshot of all this for Schuchardt is that his reliance on news articles and other disclosures concerning PRISM weighs neither in his favor nor against him. Instead,

---

pleading standard more stringent than the "short and plain statement" of the claim under Rule 8).

these public reports (and the leaked classified materials accompanying them) are simply part and parcel of the "factual matter" that must be considered in assessing the plausibility of his allegations. We will therefore examine those reports in conjunction with the rest of Schuchardt's pleadings to ascertain whether he plausibly alleged a particularized injury under Article III.

2

Based on our review of the pleadings, the plausibility of Schuchardt's alleged injury—that the Government has been "unlawfully intercepting, accessing, monitoring and/or storing [his] private communications," App. 95—depends on the plausibility of his assertion that PRISM functions as an indiscriminate dragnet which captures "all or substantially all of the e-mail sent by American citizens." App. 82. Aside from this sweeping allegation, Schuchardt has supplied no facts suggesting how (or why) the Government would have been interested in his online activity. His burden, therefore, was to allege enough "factual matter" to make plausible the Government's virtual dragnet. *Iqbal*, 556 U.S. at 679; *see also Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

Schuchardt pleaded facts drawn from news articles published by the *Guardian*, as well as the leaked and purportedly classified materials from which those articles were derived. As we noted in Part I.B, *supra*, these documents state that the NSA, through PRISM, has obtained "direct" access to the technical facilities of several major internet service providers. App. 53, 84. They indicate specific dates for when those providers granted the Government access, App. 60, and that the degree of access those providers granted enables the Government to query their facilities at

will for "real-time interception of an individual's internet activity." App. 66. They also describe the types of activity that may be accessed, encompassing "both the content and metadata of . . . private e-mail communications" sent by those providers on behalf of their subscribers. App. 59, 96. Finally, they claim that the rate of data "[c]ollection is outpacing [the Government's] ability to ingest, process and store [the data] to the 'norms' to which [it has] become accustomed," App. 64, and that the NSA's overriding surveillance goal is to "[c]ollect it [a]ll," App. 61.

By including these factual averments in his second amended complaint, Schuchardt outlined a coherent and plausible case supporting his PRISM-as-dragnet allegations. First, his alleged facts specify, at least to some degree, the means through which the NSA captures "all or substantially all of the e-mail sent by American citizens," App. 82, namely, by compelling companies that provide email and other internet services to cooperate with the NSA in the collection of their customers' data. Although the technical details of how each company's email service integrates within PRISM's infrastructure are not specified, "on a motion to dismiss, we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 781, 889 (1990)). Moreover, according to the NSA itself, PRISM entails data "collection directly from the servers" of these companies, and Schuchardt describes events involving Lavabit, a company that resisted the Government's demands to "install a device on its server which would have provided the [Government] with access to the full content of all e-mail messages for all of Lavabit's . . . customers." *See* App. 53, 84, 87. Thus, the pleaded facts plausibly allege the technical

27

means through which PRISM purportedly achieves a nationwide email dragnet.[9]

Second, Schuchardt's allegations are replete with details confirming PRISM's operational scope and capabilities. The exhibits attached to his second amended complaint include a slide from a purported NSA presentation identifying company names and the dates they began cooperating with the agency. Another slide confirms that—consistent with a dragnet capturing "all or substantially all of the e-mail sent by American citizens"—the scale of the data collected by PRISM is so vast that the Government reported difficulty processing it according "to the 'norms' to which [it has] become accustomed." App. 64; *see also* App. 52

---

[9] We do not read the Ninth Circuit's opinion in *Jewel* to suggest a different conclusion. To be sure, the plaintiff in *Jewel* was able to allege "with particularity" that her communications were seized by "focus[ing]" her complaint on interceptions occurring at a specific technical facility operated by a single telecommunications provider. *See* 673 F.3d at 910 (discussing the plaintiff's allegations concerning AT&T's "SG3 Secure Room" and "particular electronic communications equipment" at the company's "Folsom Street" facility in San Francisco). Although the details she alleged were quite colorful, they differ in degree, not in kind from Schuchardt's averments. In both cases, the parties relied on an insider account of the alleged surveillance program at issue—Schuchardt on a former NSA contractor, and *Jewel* on a former AT&T telecommunications technician. Those insiders in turn have relied either on documentary evidence allegedly produced by the Government itself, or their personal experiences in executing the surveillance program.

(characterizing PRISM as the "SIGAD Used Most in NSA Reporting");[10] App. 61 (indicating the NSA's "New Collection Posture" of "Collect[ing] it All").

Finally, the pleaded facts support Schuchardt's allegation that the scope of PRISM's data collection encompasses his personal email. The NSA presentation identifies specific companies participating in the PRISM program, and indicates that NSA analysts receive the content of emails collected as part of the program. Schuchardt alleged that he uses email services provided by two of those companies—Google and Yahoo—so we need not speculate about whether Schuchardt's own communications were captured because he specified the scope of PRISM's dragnet with enough "factual matter" to make additional inferential leaps unnecessary. *See Klayman*, 800 F.3d at 559 (opinion of Brown, J.) (permitting the inference that the bulk telephone metadata program under Section 215 encompassed the plaintiff's communications in light of facts alleging "the government's efforts to 'create a *comprehensive* metadata database.'").

3

The Government raises three principal arguments challenging the plausibility of Schuchardt's PRISM

---

[10] SIGAD stands for the term "Signals Intelligence Activity Designator," which "is an alphanumeric designator that identifies a facility used for collecting Signals Intelligence (SIGINT)." Laura K. Donohue, *Section 702 and the Collection of International Telephone and Internet Content*, 38 Harv. J. L. & Pub. Pol'y 117, 119 n.3 (2015).

allegations. First, it argues that *Clapper* and its application by the D.C. Circuit in *Klayman* require us to find his allegations implausible. We disagree.

Two aspects of *Clapper* distinguish it from this case. First, because the *Clapper* plaintiffs raised a facial constitutional challenge to Section 702 on the day the statute was enacted, they pleaded only *prospective* injury, *i.e.*, "potential future surveillance." *See* 133 S. Ct. at 1150. And because that "potential" relied on a "speculative chain of possibilities," the Supreme Court concluded that they had failed to satisfy the imminence and traceability elements of injury-in-fact under Article III. Here, in contrast, Schuchardt's alleged injury has already occurred insofar as he claims the NSA seized his emails. It is therefore not surprising that the Government has been unable to formulate an analogous "speculative chain" that would doom Schuchardt's constitutional standing.

Another critical distinction between this case and *Clapper* is that the district court entered summary judgment, a procedural posture that required the plaintiffs to identify a triable issue of material fact supported by an evidentiary record. *See id.* at 1146, 1149. In contrast, Schuchardt sought to avoid dismissal in a facial jurisdictional challenge raised under Rule 12(b)(1), which requires him only to state a plausible claim, a significantly lighter burden. This distinction in the standard of review is also reflected in cases concerning national security surveillance from our sister courts. *Compare ACLU*, 785 F.3d at 800 (plaintiffs had standing on motion to dismiss); *Jewel*, 673 F.3d at 906–07 (same), *with Klayman*, 800 F.3d at 568 (opinion of Williams, J.) (plaintiffs lacked standing to pursue preliminary injunction because there was no "substantial likelihood" that they could establish injury-in-

fact, observing that summary judgment imposes a *"lighter burden"* than the "substantial likelihood of success" necessary to obtain a preliminary injunction); *ACLU v. NSA*, 493 F.3d 644, 650–51, 667–70 (6th Cir. 2007) (plaintiffs failed to establish injury-in-fact on summary judgment because they had "no evidence" on various points of causation). Here, Schuchardt has gone beyond mere allegations to survive a motion to dismiss by creating a limited evidentiary record to support his allegations.

The Government's reliance on *Klayman* is also misplaced. There, the D.C. Circuit vacated the district court's preliminary injunction, holding that the plaintiffs had failed to demonstrate a substantial likelihood of success on the merits. *See* 800 F.3d at 561. However, the panel split on the issue of the plaintiffs' standing, and also disagreed on whether to remand the case for further proceedings or outright dismissal. *See id.* at 564 (opinion of Brown, J.) (plaintiffs had satisfied "the bare requirements of standing," remanding for jurisdictional discovery); *id.* at 565 (opinion of Williams, J.) (plaintiffs lacked standing to seek preliminary injunction, remanding for jurisdictional discovery); *id.* at 569 (opinion of Sentelle, J.) (plaintiffs lacked standing *vel non*, remanding with order to dismiss). Under these circumstances, it seems clear to us that *Klayman*'s persuasive force is minimized by its splintered reasoning, different procedural posture, and the fact that the D.C. Circuit addressed itself to a now-defunct surveillance program authorized by a separate provision of FISA. Accordingly, neither *Clapper* nor *Klayman* supports the Government in this case.

Second, the Government contends that Schuchardt's allegations "say at most that the government may have the *capability* to seize and store *most* electronic

communications," but "[t]hey do not say that the government is searching or seizing most, let alone all, e-mail." Gov't Br. 21. We agree that Schuchardt's alleged facts—even if proven—do not conclusively establish that PRISM operates as a dragnet on the scale he has alleged. The language of the leaked materials Schuchardt relies on is imprecise. The use of the term "direct" in the NSA's presentation could mean, for example, that the Government has complete discretion to search all electronic information held by a company participating in PRISM at will; this would certainly be consistent with the "real-time" interception capability that the NSA allegedly possesses, and could qualify as an unconstitutional "seizure" of all information stored on the company's servers. On the other hand, "direct" could mean that the Government merely has the legal authority to compel participating companies to turn over "communications that may be of foreign-intelligence value because they are . . . associated with the e-mail addresses that are used by suspected foreign terrorists." Gov't Br. 22. In that scenario, it is implausible that Schuchardt's communications would be targeted by PRISM.

At this early stage of litigation, however, Schuchardt is entitled to any inference in his favor that may be "reasonably" drawn from his pleaded facts. *See, e.g.*, *King Drug Co. of Florence, Inc. v. SmithKline Beecham Corp.*, 791 F.3d 388, 398 n.11 (3d Cir. 2015) (citing *Iqbal*, 556 U.S. at 678–79). And as we have explained, the inference that PRISM "collects all or substantially all of the e-mail sent by American citizens," App. 82, is one supported by his pleaded "factual matter." Accordingly, in this procedural posture, we cannot accept the Government's preferred inference.

32

Finally, the Government disputes the notion that PRISM is a dragnet, *i.e.*, that it is "based on the indiscriminate collection of information in bulk." *See* Gov't Br. 22 (quoting PCLOB Report at 111). According to the Government, "the program consists entirely of targeting specific persons that may be of foreign-intelligence value because they are, for example, associated with the e-mail addresses that are used by suspected foreign terrorists." *Id*. Under this view, to intercept communications using PRISM:

> Analysts first identify a non-U.S. person located outside the United States who is likely to communicate certain types of foreign intelligence information, such as an individual who belongs to a foreign terrorist organization or facilitates its activities. Analysts also attempt to identify a means by which this foreign target communicates, such as an e-mail address, or a telephone number; any such address, number, or other identifier is known as a "selector." PRISM collection occurs when the government obtains from telecommunications providers . . . communications sent to or from specified selectors.

Gov't Br. 6–7 (internal citations omitted).

Several commentators[11] and the few courts[12] that have examined PRISM appear to agree with the Government's

---

[11] *See, e.g.*, Donohue, *supra* note 8, at 119 n.2 ("Once foreign intelligence acquisition has been authorized under Section 702, the government sends written directives to electronic communication service providers compelling their

assistance in the acquisition of communications." (quoting PCLOB Report at 7)); Nathan Alexander Sales, *Domesticating Programmatic Surveillance: Some Thoughts on the NSA Controversy*, 10 I/S: J. L. & Pol'y for Info. Soc'y 523, 526 (2014) ("[In] PRISM . . . the NSA targets specific non-Americans who are reasonably believed to be located outside the country, and also engages in bulk collection of some foreign-to-foreign communications that happen to be passing through telecommunications infrastructure in the United States."). The *Washington Post* also amended its initial report on PRISM to suggest that "imprecision on the part of the NSA" in the wording of its presentation left open the possibility that PRISM collection still required the agency to request materials from the participating companies, rather than directly from the companies' servers. *See* Jonathan Hall, *Washington Post Updates, Hedges on Initial PRISM Report*, Forbes (June 7, 2013, 9:08 PM), https://perma.cc/7L6A-H22D.

[12] *See, e.g.*, *United States v. Hasbajrami*, 2016 WL 1029500, at *6 (E.D.N.Y. Mar. 8, 2016) ("In PRISM collection, the government identifies the user accounts it wants to monitor and sends a 'selector'—a specific communications facility, such as a target's email address or telephone number—to the relevant communications service provider. A government directive then compels the communications service provider to give it communications sent to or from that selector (*i.e.*, the government 'tasks' the selector)." (internal citations omitted)); *Wikimedia Found. v. NSA*, 143 F. Supp. 3d 344, 348–49 (D. Md. 2015) ("Under a surveillance program called 'PRISM,' U.S.-based Internet Service Providers furnish the NSA with electronic

view of the program's "targeted" nature. So too has the PCLOB, whose report on PRISM the Government has asked us to consider. *See* PCLOB Report at 33–34. These authorities are substantial, and if correct, would tend to undermine Schuchardt's ability to show that his own electronic communications were seized by the PRISM program.

The problem for the Government at this stage is that the scope of materials that a court may consider in evaluating a facial jurisdictional challenge raised in a motion under Rule 12(b)(1) is not unconstrained. As with motions under Rule 12(b)(6), the court is limited to the four corners of the complaint, "document[s] *integral to or explicitly relied* upon in the complaint," and "any undisputedly authentic document that a defendant attaches . . . if the plaintiff's claims are based on the document." *In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 133 & n.7 (3d Cir. 2016) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Schuchardt's pleadings are in no way "based on" any countervailing authorities that support the Government's position, nor are those authorities integral to or explicitly relied upon by his complaint—accordingly, we must ignore their persuasive value, whatever it may be, at this stage of the litigation. *See Gould Elecs.*, 220 F.3d at 176. Likewise, insofar as the Government's arguments present new information disagreeing with the factual premises underlying Schuchardt's claims, we cannot consider them in this *facial* jurisdictional challenge, the sole purpose of which is to test the legal sufficiency of the plaintiff's jurisdictional

communications that contain information specified by the NSA.").

averments. Instead, disagreements concerning jurisdictional facts should be presented in a *factual* challenge, at which time the court, after allowing the plaintiff "to respond with evidence supporting jurisdiction," may fully adjudicate the parties' dispute, including the resolution of any questions of fact. *Id*. at 177.

V

Our decision today is narrow: we hold only that Schuchardt's second amended complaint pleaded his standing to sue for a violation of his Fourth Amendment right to be free from unreasonable searches and seizures. This does not mean that he *has* standing to sue, as the Government remains free upon remand to make a factual jurisdictional challenge to Schuchardt's pleading. In anticipation of such a challenge, we provide the following guidance to the District Court on remand.

Schuchardt has suggested that he is entitled to jurisdictional discovery. *See* Transcript of Oral Argument at 40–41, *Schuchardt v. Obama*, No. 15-3491 (3d Cir. May 17, 2016). We leave that question to the District Court's discretion with the caveat that "jurisdictional discovery is not available merely because the plaintiff requests it." *Lincoln Benefit Life Ins. Co. v. AEI Life, LLC*, 800 F.3d 99, 108 n.38 (3d Cir. 2015). Jurisdictional discovery is not a license for the parties to engage in a "fishing expedition," *id*., and that fact is particularly true in a case like this one, which involves potential issues of national security. In this very context, the Supreme Court has cautioned that jurisdictional discovery—even if conducted *in camera*—cannot be used to probe the internal (and most likely classified) workings of the national security apparatus of the United States. *See Clapper*, 131 S.

Ct. at 1149 n.4 ("[T]his type of hypothetical disclosure proceeding would allow a terrorist (or his attorney) to determine whether he is currently under U.S. surveillance simply by filing a lawsuit challenging the Government's surveillance program."). For that reason, the District Court should take care to circumscribe the scope of discovery and any *ex parte* and *in camera* procedures to only the factual questions necessary to determine its jurisdiction.[13]

Finally, nothing in our opinion should be construed to preclude the Government from raising any applicable privileges barring discovery—including the state secrets doctrine—or to suggest how the District Court should rule on any privilege the Government may choose to assert. *See United States v. Reynolds*, 345 U.S. 1, 10 (1953).

---

[13] For example, the linchpin of Schuchardt's standing is his allegation that PRISM collects "all or substantially all of the e-mail sent by American citizens." The District Court may wish to consider what discovery is necessary for it to adjudicate the veracity of that allegation while permitting Schuchardt an adequate evidentiary response. *See also Jewel v. NSA*, 2015 WL 545925, at *4 (N.D. Cal. Feb. 10, 2015) (holding that plaintiffs had failed to establish their standing to challenge Upstream, another putative NSA electronic surveillance program, because "the evidence at summary judgment [was] insufficient to establish that the Upstream collection process operates in the manner in which Plaintiffs allege[d] it does").

\*     \*     \*

For the stated reasons, we will vacate the District Court's order dismissing Schuchardt's second amended complaint and remand for proceedings consistent with this opinion.