DIAZ, Circuit Judge:
The Wikimedia Foundation and eight other organizations appeal the dismissal of their complaint challenging Upstream surveillance, an electronic surveillance program operated by the National Security Agency (the “NSA”). The district court, relying on the discussion of speculative injury from Clapper v. Amnesty International USA, 568 U.S. 398, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), held that the allegations in the complaint were too speculative to establish Article III standing. We conclude that Clapper's, analysis of speculative injury does not control this case, since the central allegations here are not speculative. Accordingly, as for Wikimedia, we vacate and remand because it makes allegations sufficient to survive a facial challenge to standing. As for the other Plaintiffs, we affirm because the complaint does not contain enough well-pleaded facts entitled to the presumption of truth to establish their standing.
I.
A.
Before diving into the details of Plaintiffs’ complaint, we provide an overview of the Foreign Intelligence Surveillance Act (“FISA”), 50 U.S.C. § 1801 et seq., the statute from which the government derives its authority to conduct Upstream surveillance.
Congress enacted FISA in 1978 to regulate electronic surveillance undertaken to gather foreign intelligence information. David S. Kris & J. Douglas Wilson, National Security Investigations and Prosecutions § 3:8 (2d ed.), Westlaw (database updated Aug. 2016) (hereinafter Kris & Wilson); see also 50 U.S.C. § 1801 (defining electronic surveillance). FISA created two specialized courts—the Foreign Intelligence Surveillance Court (the “FISC”), from which the government generally must obtain authorization before conducting electronic surveillance, and the Foreign Intelligence Surveillance Court of Review, which has jurisdiction to review the denial of a FISA application for electronic surveillance. Kris & Wilson § 5:1. As originally enacted, FISA required the government to demonstrate probable cause to believe that the target of its surveillance was “a foreign power or an agent of a foreign power,” and that the facility or place at which surveillance would be directed was “being used, or is about to be used, by a foreign power or an agent of a foreign power.” 50 U.S.C. § 1805(a)(2); see also Kris & Wilson § 7:2.
“Until 2008, FISA applied only to investigative conduct inside the United States.” Kris & Wilson § 4:2. That changed through the FISA Amendments Act of 2008, which authorized the government to acquire foreign-intelligence information by targeting for up to one year non-U.S. persons reasonably believed to be abroad. See 50 U.S.C. § 1881a. FISA Section 702, 50 U.S.C. § 1881a, sets forth the process for obtaining that authority.
Generally, the Attorney General and the Director of National Intelligence initiate the process by submitting a “certification” regarding the proposed surveillance to the FISC for approval. Id. § 1881a(g)(1)(A). *201 That certification must attest, inter alia, that:
(1) procedures are in place “that ... are reasonably designed” to ensure that an acquisition is “limited to targeting persons reasonably believed to be located outside” the United States; (2) minimization procedures adequately restrict the acquisition, retention, and dissemination of nonpublic information about uncon-senting U.S. persons ...; (3) guidelines have been adopted to ensure compliance with targeting limits and the Fourth Amendment; and (4) the procedures and guidelines ... comport with the Fourth Amendment.
Clapper, 133 S.Ct. at 1145 (quoting 50 U.S.C. § 1881a(g)(2)).
The FISC reviews the certification to ensure that it contains the statutorily required elements and has targeting and minimization procedures that are both consistent with the Fourth Amendment and are “reasonably designed” to meet certain requirements. Id. In particular, the FISC must find that the targeting procedures are “reasonably designed” to: (i) ensure that acquisition “is limited to targeting persons reasonably believed to be located outside the United States,” and (ii) “prevent the intentional acquisition of’ wholly domestic communications. 50 U.S.C. § 1881a(i)(2)(B). The FISC must also find that the minimization procedures are “reasonably designed in light of the purpose and technique of the particular surveillance, to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information.” Id. § 1801(h)(1); see id. § 1881a(i)(2)(C) (referring to § 1801(h)).
Section 702 prohibits the intentional targeting of “any person known at the time of acquisition to be located in the United States,” id. § 1881a(b), but allows the government to intercept communications between a U.S. person inside the country and a foreigner abroad targeted by intelligence officials, see id. § 1881a(a)-(b); see also Kris & Wilson § 17:5. Furthermore, surveillance under Section 702 may be conducted for purposes other than counterter-rorism—the statute defines “foreign intelligence information” to mean, among other things, information that relates to “the conduct of the foreign affairs of the United States,” 50. U.S.C. § 1801(e)(2)(B)—and the government need not identify “the specific facilities, places, premises, or property at which” it will direct surveillance, id. § 1881a(g)(4).
The absence of particularity and probable cause requirements in Section 702 surveillance allows the government to monitor the communications of thousands of individuals and groups under a single FISC Order. See Office of the Director of National Intelligence, Calendar Year 2014 Statistical Transparency Report 1-2 (2015) (stating that in 2014 the government used its authority pursuant to Section 702 to target an estimated 92,707 persons, groups, and entities under one FISC Order).[1] Furthermore, the minimization procedures allow the government to retain communications—including those of U.S. persons—if the government concludes that they contain “foreign intelligence” information. See Kris & Wilson §§ 9:5, 17:5.
The government has acknowledged that it conducts two forms of surveillance under Section 702—PRISM and Upstream. See Privacy and Civil Liberties Oversight Board, Report on the Surveillance Pro *202 gram Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act 7 (2014) (hereinafter PCLOB Report).[2] Only Upstream is at issue here. Though the government has disclosed some information about Upstream, most technical details of the surveillance process remain classified. See Jewel v. Nat’l Sec. Agency, 810 F.3d 622, 627 (9th Cir. 2015).
B.
In June 2015, Plaintiffs—educational, legal, human rights, and media organizations—filed their first amended complaint wherein they ask for, among other things, a declaration that Upstream surveillance violates the First and Fourth Amendments, an order permanently enjoining the NSA from conducting Upstream surveillance, and an order directing the NSA “to purge all records of Plaintiffs’ communications in their possession obtained pursuant to Upstream surveillance.” J.A. 84.
Plaintiffs make two central allegations. First, in what we refer to as the Wikime-dia Allegation, Wikimedia alleges that “the sheer volume of [its] communications makes it virtually certain that the NSA has intercepted, copied, and reviewed at least some of [its] communications.”[3] J.A. 46. Second, in what we refer to as the Dragnet Allegation, all nine Plaintiffs allege that in the course of conducting Upstream surveillance the NSA is “intercepting, copying, and reviewing substantially all” text-based communications entering and leaving the United States, including their own. J.A. 46. After setting forth supporting background relevant to each, we describe the Wikimedia and Dragnet Allegations.
1.
Plaintiffs allege that “Upstream surveillance involves the NSA’s seizing and searching the [I]nternet communications of U.S. citizens and residents en masse as those communications travel across the [I]nternet ‘backbone’ in the United States.” J.A. 40. “The [I]nternet backbone is the network of high-capacity cables, switches, and routers [administered by teleeommunications-serviee providers] that facilitates both domestic and international communication via the [I]nternet.” J.A. 40. It includes “the approximately 49 international submarine cables that carry [Internet communications into and out of the United States and that land at approximately 43 different points within the country.” J.A. 42.
The NSA performs Upstream surveillance by first identifying a target and then identifying “selectors” for that target. Selectors are the specific means by which the target communicates, such as e-mail addresses or telephone numbers. Selectors cannot be keywords (e.g., “bomb”) or names of targeted individuals (e.g., “Bin Laden”).
The NSA then “tasks” selectors for collection and sends them to telecommunications-service providers. Those providers must assist the government in intercepting communications to, from, or “about” the selectors. “About” communications are those that contain a tasked selector in their content, but are not to or from the target. “For instance, a communication between two third parties might be acquired because it contains a targeted email address in the body of the communication.” PCLOB Report at 119.
We note an important distinction between Internet transactions and Internet *203 communications. While Upstream surveillance “is intended to acquire Internet communications, it does so through the acquisition of Internet transactions.” PCLOB Report at 39. An example illustrates the point. When an individual sends an email on the Internet, the message is broken up into one or more “data packets” which are transmitted across the Internet backbone to their destination and, upon arrival, reassembled by the recipient’s computer to reconstruct the communication. The individual data packets generated by a single email can take “different routes [across the backbone] to their common destination.” PCLOB Report at 125. Relatedly, when two people communicate, the data packets from the target can take a different path along the backbone than the data packets to the target. “The government describes an Internet ‘transaction’ as ‘a complement of packets traversing the Internet that together may be understood by a device on the Internet and, where applicable, rendered in an intelligible form to the user of that device.’ ” Redacted, 2011 WL 10945618, at *9 n.23 (FISA Ct. Oct. 3, 2011) (quoting a government submission to the FISC).[4] An Internet transaction can comprise one or many discrete communications.
“To identify and acquire Internet transactions associated with the Section 702-tasked selectors on the Internet backbone, Internet transactions are first filtered to eliminate potential domestic transactions, and then are screened to capture only transactions containing a tasked selector. Unless transactions pass both these screens, they are not ingested into government databases.” PCLOB Report at 37. “If a single discrete communication within [a multi-communication transaction] is to, from, or about a Section 702-tasked selector, and at least one end of the transaction is foreign, the NSA will acquire the entire [multi-communication transaction].” PCLOB Report at 39. Once acquired, communications are subject to FISC-approved minimization procedures. The NSA’s minimization procedures, for example, limit the types of queries that analysts can conduct across data sets of Section 702-acquired information.
Plaintiffs allege that Upstream surveillance works in practice as follows. First, the NSA copies “substantially all international text-based communications—and many domestic ones—flowing across certain high-capacity cables, switches, and routers” by “[u]sing surveillance devices installed at key access points along the [I]nternet backbone.” J.A. 43. Second, it “attempts to filter out and discard some wholly domestic communications,” though that effort “is incomplete.” J.A. 43. Third, it reviews the full content of the copied communications for targeted selectors, including IP addresses. J.A. 43. Finally, it “retains [and with few restrictions analyzes] all communications that contain selectors associated with its targets, as well as those that happen to be bundled with them in transit.” J.A. 44.
2.
Wikimedia asserts that the NSA is intercepting, copying, and reviewing at least some of its communications in the course of Upstream surveillance, “even if the NSA conducts Upstream surveillance on only a single [I]nternet backbone link.” J.A. 49. Wikimedia, “the operator of one of the most-visited websites in the world,” alleges that it “engages in more than one trillion international communications each year, with individuals who are located in virtually every country on earth.” J.A. 56. According to Wikimedia, Upstream sur *204 veillance implicates three categories of its communications: (1) communications with its community members; (2) internal “log” communications, which include users’ IP addresses and the URLs of webpages sought by users; and (3) communications between its staff and individuals around the world. J.A. 55-56.
. Wikimedia further alleges that “[g]iven the relatively small number of international chokepoints,”[5] the volume of its communications, and the geographical diversity of the people with whom it communicates, its “communications almost certainly traverse every international backbone link connecting the United States with the rest of the world.” J.A. 47-48. And, Wikimedia alleges, “in order for the NSA to reliably obtain communications to, from, or about its targets in the way it has described, the government must be copying and reviewing all the international text-based communications that travel across a given link.” J.A. 48.
That last allegation is so, says Wikime-dia, because “as a technical matter, the government cannot know beforehand which communications will contain selectors associated with its targets, and therefore it must copy and review all international text-based communications transiting [a] circuit in order to identify those of interest.” J.A. 48. That is because data packets that constitute a communication “travel independently of one another, intermingled with packets of other communications in the stream of data,” and “the packets of interest cannot be segregated from other, unrelated packets in advance.” J.A. 49. Thus, the NSA must “copy all such packets traversing a given backbone link, so that it can reassemble and review the transiting communications.” J.A. 49.
Tying these allegations together, Wik-imedia asserts that if the NSA is monitoring a single [IJnternet backbone link, then the NSA is intercepting, copying, and reviewing at least some of Wikimedia’s communications. According to Wikimedia, “the NSA has confirmed that it conducts Upstream surveillance at more than one point along the [I]nternet backbone.” J.A. 49. In addition to the PCLOB Report’s confirmation of the program’s existence, Wikimedia points to a purported NSA slide which shows that a single telecommunications-service provider is facilitating Upstream surveillance at “seven major international chokepoints in the United States” and a purported NSA document which states that the NSA is expending significant resources to “create collection/processing capabilities at many of the chokepoints operated by U.S. providers.” J.A. 50-51.
Wikimedia has “an acute privacy interest in its communications” because its “mission and existence depend on its ability to ensure that readers and editors can explore and contribute to [its websites] privately when they choose to do so.” J.A. 59-60. It has, in response to Upstream surveillance, taken burdensome steps to protect “the privacy of its communications and the confidentiality of the information it thereby receives.” J.A. 60-61. Among other things, Wikimedia has “self-eensor[ed] communications or forgo[ne] electronic communications altogether.” J.A. 64.
Finally, the first amended complaint alleges that “even if one assumes a 0.00000001% chance ... of the NSA copying and reviewing any particular communication, the odds of the government copying and reviewing at least one of the Plaintiffs’ *205 communications in a one-year period would be greater than 99.9999999999%.” J.A. 46-47. This is an extension of the allegation that Wikimedia engages in more than one trillion international communications each year.
3.
In the Dragnet Allegation, Plaintiffs say that “given the way the government has described Upstream surveillance, it has a strong incentive to intercept communications at as many backbone chokepoints as possible.” J.A. 49. Thus, “[i]f the government’s aim is to ‘comprehensively’ and ‘reliably’ obtain communications to, from, and about targets scattered around the world, it must conduct Upstream surveillance at many different backbone chokepoints.” J.A. 50.
Plaintiffs allege that the nature of online communication, including that data packets to a target can take different routes than data packets from a target, makes this conclusion “especially true.” J.A. 50. They also incorporate into their complaint a New York Times article asserting that the NSA “is temporarily copying and then sifting through the contents of what is apparently most e-mails and other text-based communications that cross the border.” J.A. 51.
Furthermore, Plaintiffs often communicate with individuals whom the NSA is likely to target through Upstream surveillance, and “[a] significant amount of the information that [they] exchange over the [I]nternet is ‘foreign intelligence information.’ ” J.A. 52. “Because of ongoing government surveillance, including Upstream surveillance, Plaintiffs have had to take burdensome and sometimes costly measures to” protect “the confidentiality of their sensitive information.” J.A. 52. Upstream surveillance compels them to censor their own communications and, in some instances, to forgo electronic communications altogether.
Finally, Joshua Dratel, a member of Plaintiff National Association of Criminal Defense Lawyers, also challenges Upstream surveillance. One of Dratel’s clients “has received notice of [Section 702 surveillance], and [Dratel] previously represented a client in another case where officials have told Congress that the government used [Section 702 surveillance] in the course of its investigation.” J.A. 68-69.
C.
The government moved to dismiss for lack of standing and submitted evidence, including declarations by Robert Lee and Alan Salzberg. The Lee Declaration challenges Plaintiffs’ assertion that, as a technical matter, the NSA must be copying all data packets that traverse a given backbone link. The Salzberg Declaration attacks Plaintiffs’ probability calculation that there’s a greater than 99.9999999999% chance that the NSA is copying and reviewing their communications.
The district court, relying on Clapper, held that Plaintiffs had failed to establish standing because their allegations “depend on suppositions and speculation, with no basis in fact, about how the NSA implements Upstream surveillance.” J.A. 190. The court characterized the government’s motion as a facial challenge, and thus did not consider either declaration. Because so much of the district court’s opinion depends on Clapper, we summarize that case first.
1.
In Clapper, plaintiffs (including six of the nine Plaintiffs here, but not including Dratel or Wikimedia) lodged a facial challenge to Section 702 on the day that the law went into effect, seeking declaratory and injunctive relief. 138 S.Ct. at 1145-46. *206 They alleged that their work required them to “engage in sensitive and sometimes privileged telephone and e-mail communications with ... individuals located abroad” who were “likely targets of surveillance under” Section 702. Id. at 1145. Plaintiffs had two separate theories of Article III standing: (1) there was an “objectively reasonable likelihood” that their communications would be intercepted in the future pursuant to Section 702 surveillance, and (2) they were forced to undertake costly and burdensome measures to avoid a substantial risk of surveillance. Id. at 1146. They did not, however, have “actual knowledge of the Government’s [Section 702] targeting practices.” Id. at 1148.
The Supreme Court held that neither injury established standing at the summary judgment stage. The theory of standing based on interception of communications “relie[d] on a highly attenuated chain of possibilities, [which did] not satisfy the requirement that threatened injury must be certainly impending.” Id. at 1147-48. The Court broke the speculative chain into five parts:
(1) the Government will decide to target the communications of non-U.S. persons with whom [plaintiffs] communicate; (2) in doing so, the Government will choose to invoke its authority under [Section 702] rather than utilizing another method of surveillance; (3) the Article III judges who serve on the [FISC] will conclude that the Government’s proposed surveillance procedures satisfy [Section 702’s] many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of [plaintiffs’] contacts; and (5) [plaintiffs] will be parties to the particular communications that the Government intercepts.
Id. at 1148.
“[A]t the summary judgment stage,” the Court noted, plaintiffs “can no longer rest on mere allegations [to establish standing], but must set forth by affidavit or other evidence specific facts.” Id. at 1148^9 (alteration and internal quotation marks omitted). The Clapper plaintiffs, however, had no “specific facts demonstrating that the communications of their foreign contacts w[ould] be targeted.” Id. at 1149.
The assertion of harm based on measures taken to avoid surveillance also didn’t suffice. Because “the harm [plaintiffs] s[ought] to avoid [wa]s not certainly impending,” the Court explained, they couldn’t “manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm.” Id. at 1151. In other words, plaintiffs had failed to show that “[a]ny ongoing injuries” they were suffering were “fairly traceable” to Section 702 surveillance. Id. The Court suggested, however, that a lawyer who represented a target of Section 702 surveillance might have standing. Id. at 1154.
Applying these principles, the district court in this case reasoned that while
more is known about the nature and capabilities of NSA surveillance than was known at the time of Clapper, ... no more is known about whether Upstream surveillance actually intercepts all or substantially all international text-based Internet communications, including plaintiffs’ communications.... Indeed, plaintiffs’ reliance on the government’s capacity and motivation to collect substantially all international text-based Internet communications is precisely the sort of speculative reasoning foreclosed by Clapper.
J.A. 192. The court supported that conclusion with two observations relevant here: (1) it is unclear whether the NSA is “using [its] surveillance equipment to its full potential” to intercept “all communications *207 passing through” chokepoints upon which the NSA has installed surveillance equipment, and (2) “the fact that all NSA surveillance practices must survive FISC review ... suggests that the NSA is not using its surveillance equipment to its full potential.” J.A. 190-91.
The district court also rejected the argument that Clapper “does not control here because plaintiffs are different from the Clapper plaintiffs.” J.A. 194. The court focused on Dratel and Wikimedia. With respect to Dratel, the court concluded that the allegations failed to “plausibly establish that the information gathered from the two instances of Section 702 surveillance was the product of Upstream surveillance,” and that it “appears substantially more likely that PRISM collection was used in [those] cases.” J.A. 195.
As for Wikimedia, the court found that “the statistical analysis on which the argument rests [ (i.e., the probability calculation that there’s a greater than 99.9999999999% chance that the NSA is copying and reviewing Wikimedia’s communications) ] is incomplete and riddled with assumptions,” and that “[ljogically antecedent to plaintiffs’ flawed statistical analysis are plaintiffs’ speculative claims about Upstream surveillance based on limited knowledge of Upstream surveillance’s technical features and ‘strategic imperatives.’ ”[6] See J.A. 197-99.
From the district court’s dismissal of their complaint for lack of standing, Plaintiffs appeal.
II.
We review the district court’s decision de novo, Columbia Gas Transmission Corp. v. Drain, 237 F.3d 366, 369 (4th Cir. 2001), and proceed as follows. First, we lay out the framework for deciding whether a plaintiff has established standing at the motion-to-dismiss stage. Then, we review the Wikimedia and Dragnet Allegations to see whether either establishes standing. We conclude that the Wikimedia Allegation does and the Dragnet Allegation does not.
A.
1.
Article III of the Constitution limits the jurisdiction of federal courts to “Cases” and “Controversies.” U.S. Const, art. Ill, § 2. “The doctrine of standing gives meaning to these constitutional limits by ‘identifying] those disputes which are appropriately resolved through the judicial process.’ ” Susan B. Anthony List v. Driehaus, — U.S.-, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) (alteration in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). To establish standing, a plaintiff must show: (1) an injury in fact; (2) a" sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. Id.
“To establish injury in fact, a plaintiff must show that he or she suffered ‘an invasion of a legally protected interest’ that is ‘concrete and particularized’ and ‘actual or imminent, not conjectural or hypothetical.’ ” Spokeo, Inc. v. Robins, — U.S. -, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting Lujan, 504 • U.S. at 560, 112 S.Ct. 2130). “For an injury to be particularized, it must affect the plaintiff in a personal and individual way.” Id. (internal quotation marks omitted). *208 “The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance.” Id. at 1548 n.7. The purpose of the imminence requirement “is to ensure that the alleged injury is not too speculative for Article III purposes.” Clapper, 133 S.Ct. at 1147. The “threatened injury must be certainly impending to constitute injury in fact, and ... [ajllegations of possible future injury are not sufficient.” Id. (second alteration in original) (internal quotation marks omitted).
“[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130. “A defendant may challenge [standing at the motion-to-dismiss stage] in one of two ways: facially or factually.”- Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017). In a facial challenge, the defendant contends that the complaint “fails to allege facts upon which [standing] can be based,” and the plaintiff “is afforded the same procedural protection” that exists on a motion to dismiss. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). In a factual challenge, the defendant contends “that the jurisdictional allegations of the complaint [are] not true.” Id. In that event, a trial court may look beyond the complaint “and in an evi-dentiary hearing determine if there are facts to support the jurisdictional allegations.” Id.
“To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, ‘to state a claim to relief that is plausible on its face.’ ” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). We accept as true all well-pleaded facts in a complaint and construe them in the light most favorable to the plaintiff. SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015). Indeed, a court cannot “favor[] its perception of the relevant events over the narrative offered by the complaint,” thereby “recasting ‘plausibility’ into ‘probability.’ ” Id. at 430. However, legal conclusions pleaded as factual allegations, “unwarranted inferences,” “unreasonable conclusions,” and “naked assertions devoid of further factual enhancement” are not entitled to the presumption of truth. Id. at 422.
2.
The Third Circuit recently applied many of these principles in Schuchardt v. President of the United States, where it held that, “at least as a facial matter,” a complaint challenging PRISM surveillance— the other form of publicly acknowledged Section 702 surveillance—“plausibly stated an injury in fact” sufficient to establish standing. 839 F.3d 336, 338 (3d Cir. 2016). Under PRISM surveillance, the government purportedly obtains “user communications exchanged using services provided by several large U.S. companies” directly from those companies’ servers. Id. at 340.
Schuchardt’s central allegation was that the NSA is “intercepting, monitoring and storing the content of all or substantially all of the e-mail sent by American citizens, [and thus] his own online communications had been seized in the dragnet.” Id. at 341 (emphasis omitted). In support of that allegation, Schuchardt stated that he used online services targeted by PRISM surveillance and incorporated into his complaint “excerpts of the classified materials” made public through newspaper articles and filings in other cases. Id. at 341. The complaint and its exhibits described the *209 “technical means through which PRISM purportedly achieves a nationwide email dragnet” and were “replete with details confirming PRISM’s operational scope and capabilities.” Id. at 350.
For example, a slide from a purported. NSA presentation “identified] company names and the dates they began cooperating with” the NSA, while another exhibit “indicate[d] ... that the degree of access those providers granted enables the Government to query their facilities at will for ‘real-time interception of an individual’s [I]nternet activity.’ ” Id. at 349-50 (citations omitted). Another purported NSA slide “confirmed] that—consistent with a dragnet capturing ‘all or substantially all of the e-mail sent by American citizens’— the scale of the data collected by PRISM is so vast that the Government reported difficulty processing it according ‘to the norms’ to which [it has] become accustomed.” Id. at 350 (alteration in original) (citations omitted).
The Third Circuit bifurcated its analysis. First, it found Schuchardt’s allegations sufficiently particularized to satisfy the injury-in-fact requirement. Id. at 345-46. Though PRISM surveillance is “universal in scope,” the harm that Schuchardt alleged was “unmistakably personal”—“he ha[d] a constitutional right to maintain the privacy of his personal communications, online or otherwise.” Id. Moreover, “the fact that [many others] may share a similar interest d[id] not change [the injury’s] individualized nature because Schuchardt’s allegations ma[de] clear that he [wa]s among the persons” targeted by PRISM. Id. at 346 (internal quotation marks omitted).
Second, the court credited Schuchardt’s allegations as true for the purpose of resolving the facial challenge to his complaint. Id. at 346-50. The level of detail in the complaint—sufficient to describe “the technical means through which PRISM purportedly” functions and to “confirm!] PRISM’s operational scope and capabilities”—made his allegation about “the Government’s virtual dragnet” plausible. Id. at 349-50. In doing so, the Third Circuit made clear that Schuchardt’s reliance on exhibits was not disfavored, and that “[d]e-spite Clapper’s observation that the standing inquiry is ‘especially rigorous’ in matters touching on ‘intelligence gathering and foreign affairs,’ ” it knew of no instance where- a court had “imposed a heightened pleading standard for cases implicating national security,” and thus “assume[d] without deciding that” one did not apply. Id. at 348 n.8, 348-49 (quoting Clapper, 133 S.Ct. at 1147).
We find the Third Circuit’s approach persuasive and bifurcate our analyses of the Wikimedia and Dragnet Allegations in similar fashion.
B.
1.
As a reminder, the Wikimedia Allegation is that the NSA is intercepting, copying, and reviewing at least some of Wikimedia’s communications in the course of Upstream surveillance, “even if the NSA conducts Upstream surveillance on only a single [I]nternet backbone link.” J.A. 49.
We conclude that this allegation satisfies the three elements of Article III standing. We begin with injury in fact. See Spokeo, 136 S.Ct. at 1548 (defining injury in fact as the invasion of a legally protected interest that is concrete and particularized and actual or imminent). The allegation that the NSA is intercepting and copying communications suffices to show an invasion of a legally protected interest—the “Fourth Amendment right to be free from unreasonable searches and seizures.” Schuchardt, 839 F.3d at 353; see *210 also Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 801 (2d Cir. 2015) (holding at motion-to-dismiss stage that complaint challenging NSA’s bulk telephone metada-ta collection program established standing to assert a Fourth Amendment violation where alleged injury was “collection, and maintenance in a government database, of records relating to” plaintiffs).
The injury is also concrete and particularized, despite “[t]he fact that [it is] suffered by a large number of people,” because Wikimedia says that the NSA is seizing its own communications through Upstream surveillance. See Spokeo, 136 S.Ct. at 1548 n.7; accord Schuchardt, 839 F.3d at 346. And, finishing up with the injury-in-fact element, the injury “is not too speculative for Article III purposes.” Clapper, 133 S.Ct. at 1147. Indeed, there’s nothing speculative about it—-the interception of Wikimedia’s communications is an actual injury that has already occurred.
The Wikimedia Allegation also satisfies the other two elements of Article III standing. Upstream surveillance is the direct cause of the alleged injury, and there’s no reason to doubt that the requested injunctive and declaratory relief would redress the harm. See Lujan, 504 U.S. at 560-61, 112 S.Ct. 2130 (providing that the injury must be “fairly traceable” to the conduct complained of and “likely” to be redressed by a favorable decision).
However, just because this allegation satisfies the elements of Article III standing doesn’t mean that we must accept it as true for the purpose of resolving the government’s facial challenge to the complaint. Thus, we proceed to the second part of our analysis to decide whether the Wik-imedia Allegation is plausible.
Wikimedia alleges three key facts that are entitled to the presumption of truth. First, “[g]iven the relatively small number of international chokepoints,” the volume of Wikimedia’s communications, and the geographical diversity of the people with whom it communicates, Wikime-dia’s “communications almost certainly traverse every international backbone link connecting the United States with the rest of the world.” J.A. 47-48.[7]
Second, “in order for the NSA to reliably obtain communications to, from, or about its targets in the way it has described, the government,” for technical reasons that Wikimedia goes into at length, “must be copying and reviewing all the international text-based communications that travel across a given link” upon which it has installed surveillance equipment. J.A. 48. Because details about the collection process remain classified, Wik-imedia can’t precisely describe the technical means that the NSA emploj's. Instead, it spells out the technical rules of how the Internet works and concludes that, given that the NSA is conducting Upstream surveillance on a backbone link, the rules *211 require that the NSA do so in a certain way.
We would never confuse the plausibility of this conclusion with that accorded to Newton’s laws of motion. But accepting the technical rules about the Internet as true, and given that Wikimedia is applying them in an appropriate context (i.e., it uses the rules to explain the technical means through which Upstream surveillance functions), we find this conclusion reasonable and entitled to the presumption of truth.
Third, per the PCLOB Report and a purported NSA slide, “the NSA has confirmed that it conducts Upstream surveillance at more than one point along the [IJnternet backbone.” J.A. 49-51. Together, these allegations are sufficient to make plausible the conclusion that the NSA is intercepting, copying, and reviewing at least some of Wikimedia’s communications. To put it simply, Wikimedia has plausibly alleged that its communications travel all of the roads that a communication can take, and that the NSA seizes all of the communications along at least one of those roads.
Thus, at least at this stage of the litigation, Wikimedia has standing to sue for a violation of the Fourth Amendment. And, because Wikimedia has self-censored its speech and sometimes forgone electronic communications in response to Upstream surveillance, it also has standing to sue for a violation of the First Amendment. See Am. Civil Liberties Union, 785 F.3d at 802 (holding that complaint established standing to assert First Amendment violation in addition to Fourth Amendment violation because “[w]hen the government collects appellants’ metadata, appellants’ members’ interests in keeping their associations and contacts private are implicated, and any potential ‘chilling effect’ is created at that point”); see also Cooksey v. Futrell, 721 F.3d 226, 235 (4th Cir. 2013) (“In First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.”) (quotation marks and alteration omitted).
2.
The government resists this conclusion, asserting that the Wikimedia Allegation “rest[s] on speculation as to the scope and scale of Upstream collection, and the means by which that collection is accomplished.” Appellees’ Br. at 23. The district court said much the same, and the best way to address this contention is by examining the ways in which that court misapplied Clapper's discussion of speculative injury.
Unlike in Clapper, where the plaintiffs based their theories of standing on prospective or threatened injury and actions taken in response thereto, Wikimedia pleaded an actual and ongoing injury, which renders Clapper’s certainly-impending analysis inapposite here. Compare Schuchardt, 839 F.3d at 351 (distinguishing Clapper and its discussion of a “speculative chain of possibilities” because plaintiffs “alleged [Fourth Amendment] injury has already occurred insofar as he claims the NSA seized his emails”), with Beck, 848 F.3d at 267-69, 274-75 (applying Clapper’s certainly impending standard to a motion to dismiss an action under the Privacy Act of 1974, and finding plaintiffs allegation that “her information “will eventually be misused as a result of ” a data breach that compromised her personal information too speculative to establish standing).
In other words, the Wikimedia Allegation is different in kind than the facts (or lack thereof) alleged in Clapper to establish standing at summary judgment. That *212 brings us to our next point. By relying so heavily on Clapper, the district court blurred the line between the distinct burdens for establishing standing at the motion-to-dismiss and summary-judgment stages of litigation. Put another way, what may perhaps be speculative at summary judgment can be plausible on a motion to dismiss.
For example, the district court characterized Wikimedia’s allegations as “speculative” based upon its own observation that it’s unclear whether the NSA is “using [its] surveillance equipment to its full potential” to intercept “all communications passing through” chokepoints upon which the NSA has installed surveillance equipment. J.A. 190, 198-99. That observation might be appropriate with the benefit of an eviden-tiary record at summary judgment, but coming as it did on a motion to dismiss, it had the effect of rejecting Wikimedia’s well-pleaded allegations and impermissibly injecting an evidentiary issue into a plausibility determination. See Schuchardt, 839 F.3d at 347-48 (citing Twombly, 550 U.S. at 556, 127 S.Ct. 1955); SD3, 801 F.3d at 431.
The district court made the same mistake by speculating that “the fact that all NSA surveillance practices must survive FISC review ... suggests that the NSA is not using its surveillance equipment to its full potential.” J.A. 190-91. Wikimedia’s reliance at the motion-to-dismiss stage on publicly disclosed information about Upstream surveillance, purported NSA documents, technical rules about how the Internet works, and its understanding of its own operations is not, as the district court put it, “precisely the sort of speculative reasoning foreclosed by” Clapper’s discussion of how much factual material is necessary to satisfy the certainly-impending prong of the injury-in-fact element of Article III standing at summary judgment. J.A. 192.[8]
That’s not to say that all of Wikimedia’s allegations as to injury are both plausible and actual or imminent. For example, the district court was right to take issue with Wikimedia’s probability calculation, which “is incomplete and riddled with assumptions.” J.A. 197. But we need not look further into that allegation’s deficiencies, because Wikimedia doesn’t need it to establish standing.
We also reject the government’s argument that Wikimedia hasn’t pleaded enough facts to establish injury flowing from its intercepted communications. To the contrary, Wikimedia’s detailed allegations suffice to plausibly establish cognizable injuries under the First and Fourth Amendments. See Rakas v. Illinois, 439 U.S. 128, 140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (providing that the “definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing”); Cooksey, 721 F.3d at 235 (“The leniency of First Amendment standing manifests itself most commonly in the doctrine’s first element: injury-in-fact.”). At this stage of the litigation, that is enough.
Finally, we decline the government’s invitation to consider its evidence, including the two declarations, which it says “supports the district court’s analysis and undermines plaintiffs’ allegations about how they surmise Upstream surveillance operates.” Appellees’ Br. at 23. The district court treated the government’s motion to dismiss as a facial challenge to the com *213 plaint and didn’t consider the government’s evidence. We will follow suit and not look beyond the complaint and documents incorporated by reference therein. See Beck, 848 F.3d at 270 (explaining the differences between facial and factual challenges to standing). The government is free to bring a factual challenge on remand, where the district court in the first instance may consider Wikimedia’s argument—should it choose to raise it again— that the intertwined nature of the jurisdictional and merits questions precludes such a challenge.[9]
[[Image here]]
We now turn to the Dragnet Allegation, which is that the NSA is “intercepting, copying, and reviewing substantially all” text-based communications entering and leaving the United States. J.A. 46. The district court arrived at the correct conclusion as to whether this allegation establishes standing, but only by incorrectly analogizing to Clapper. As we explain below, the reason this allegation fails to establish standing is that it does not contain enough well-pleaded facts entitled to the presumption of truth.
C.
1.
The Dragnet and Wikimedia Allegations share much in common. Because each alleges the same particularized and ongoing cognizable injuries, our analysis of the injury-in-fact, traceability, and redressability elements of Article III standing with respect to the Wikimedia Allegation also applies here. But there’s a key difference in the scope of the two allegations. In the Dragnet Allegation, Plaintiffs must plausibly establish that the NSA is intercepting “substantially all” text-based communications entering and leaving the United States, whereas it’s sufficient for purposes of the Wikimedia Allegation to show that the NSA is conducting Upstream surveillance on a single backbone link. Because Plaintiffs don’t assert enough facts about Upstream’s operational scope to plausibly allege a dragnet, they have no Article III standing.
In support of a dragnet and in addition to the assertions in the Wikimedia Allegation, Plaintiffs allege the following: (1) “given the way the government has described Upstream surveillance,” including that its “aim is to ‘comprehensively’ and ‘reliably’ obtain communications to, from, and about targets scattered around the world,” the NSA “has a strong incentive to intercept communications at as many backbone chokepoints as possible,” and indeed “must” be doing so “at many different backbone chokepoints,” J.A. 49-50; (2) the technical rules governing online communications make this conclusion “especially true,” J.A. 50; and (3) a New York Times article asserts that the NSA “is temporarily copying and then sifting through the contents of what is apparently most emails and other text-based communications that cross the border,” J.A. 51.
We hold that these allegations, even when supplemented by the Wikimedia Allegation, including that the NSA is conducting Upstream surveillance on at least seven backbone links,[10] are insufficient to *214 make plausible the claim that the NSA is intercepting “substantially all” text-based communications entering and leaving the United States.
To begin with, the New York Times article is effectively a recitation of the Dragnet Allegation, and as such we ascribe little significance to it. The dissent takes issue with our treatment of this article because—as it must—it predates the complaint. Our friend misses the point. The article makes a broad statement almost identical to the Dragnet Allegation. Under the dissent’s view, one expansive allegation is enough to make plausible another almost-identical allegation. That is not the law.
Furthermore, we accept as true Plaintiffs’ allegation about what the NSA is incentivized to do, but even so, that fact, without more, doesn’t establish a dragnet. That leaves Plaintiffs with their allegation about what the NSA “must” be doing, a contention that lacks sufficient factual support to get “across the line from conceivable to plausible.” See Twombly, 550 U.S. at 570, 127 S.Ct. 1955.
A point of emphasis-—-we are not rejecting the allegation because it’s phrased as an absolute. Indeed, we’ve already credited as true Plaintiffs’ allegation that the NSA “must be copying and reviewing all the international text-based communications that travel across” backbone links which the NSA is surveilling. J.A. 48. We, did so because Wikimedia applied the rules governing Internet communications to Upstream surveillance’s stated purpose to arrive at a reasonable conclusion about the technical means through which Upstream functions on the backbone links which the NSA surveils. One ground for that conclusion’s reasonableness is that given that the NSA is surveilling a link, the rules governing Internet communications necessarily affect, to some degree, the way it surveils that link.
By contrast, in the Dragnet allegation, Plaintiffs seek to use the theory governing Internet communications in conjunction with Upstream surveillance’s stated purpose to arrive at an allegation about what the program’s operational scope must be. But neither theory nór purpose says anything about what the NSA is doing from an operational standpoint. While both are relevant factors, without more they can’t establish a dragnet. In that sense, the facts alleged here are far different than those in Schuchardt, where the plaintiff plausibly pleaded a dragnet under PRISM surveillance by describing “the technical means through which PRISM” functions and by “confirming PRISM’s operational scope and capabilities” through exhibits “replete with details.” 889 F.3d at 349-50. Those exhibits included purported NSA slides which listed “company names and the dates they began cooperating with the” NSA and “confirm[ed] that ... the scale of the data collected by PRISM is so vast that the Government [had] difficulty processing it according ‘to the norms to which [it had] become accustomed.’ ” Id. at 350.
The last hope for the Dragnet Allegation, then, is to supplement the “must” allegation with facts detailing Upstream’s operational scope. But even accepting the allegation that one teleeommunications-service provider is facilitating Upstream *215 surveillance at 7 of the approximately 49 chokepoints, we still don’t think that Plaintiffs have plausibly alleged a dragnet. The allegations here fall short of the level of detail in Schuchardt, and were we to accept Plaintiffs’ approach to standing, we would sanction the extrapolation of the plausible from the conceivable.
Our recent decision in SDS is not to the contrary. There, we considered the plausibility of a complaint alleging an antitrust conspiracy in violation of the Sherman Antitrust Act. 801 F.3d at 423. We explained that for such a “claim to survive ... a plaintiff must plead parallel conduct and something ‘more.’ ” Id. at 424 (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). “That more,” we said, “must consist of further circumstances pointing toward a meeting of the minds.” Id. (alteration and internal quotation marks omitted). The plaintiff in SD3 was able to establish that “more” by alleging the who, what, when, where, and why of a group boycott. Id. at 429-31.
Plaintiffs use our treatment of the “why” element in SDS to attach special significance to their allegation that the NSA has a strong incentive to establish a dragnet. But context is key. We observed in SDS that “motivation for common action is a key circumstantial fact.” Id. at 431 (emphasis added) (alteration and internal quotation marks omitted). It should come as no surprise that motive is an important factor when establishing an antitrust conspiracy. SDS does not, however, stand for the broad proposition that motivation is always of special significance in plausibly pleading an injury.
Relatedly, the level of detail in the SDS complaint is of a different magnitude than the one here, and further supports our conclusion about the implausibility of the Dragnet Allegation. For example, the SDS plaintiff “identifie[d] the particular time, place, and manner in which the boycott initially formed” and gave “the means by which the defendants sealed their boycott agreement: a majority vote.” Id. at 430. Those are the sorts of operational details, albeit in a case concerning a different subject matter, that are by and large absent here and which we think are vital to render plausible an allegation as sweeping as the one Plaintiffs posit. See Twombly, 550 U.S. at 558, 127 S.Ct. 1955 (“[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.”); Swanson v. Citibank, N.A., 614 F.3d 400, 405 (7th Cir. 2010) (“A more complex case involving financial derivatives, or tax fraud that the parties tried hard to conceal, or antitrust violations, will require more detail, both to give the opposing party notice of what the case is all about and to show how, in the plaintiffs mind at least, the dots should be connected.”).
The dissent says that this analysis is flawed because the NSA’s inability to predict a communication’s path paired with its desire to “comprehensively acquire communications” renders plausible the allegation of a dragnet. The dissent thinks that’s a “logical extension” of our crediting as true Wikimedia’s allegation that the NSA reviews all communications that flow across each link that it surveils. Clearly, there are some similarities, in the sense that each allegation depends, in part, on the application of internet theory to a statement about Upstream’s purpose. But, perhaps because it fails to grapple with any of the relevant case law, the dissent misses two subtle but key distinctions.
The allegation that we credit as true uses theory to explain how the NSA is doing something, given a defined operational scope. Moreover, that theory necessarily affects the way the NSA does what we know it to be doing. Conversely, the *216 allegation that we do not credit as true uses theory to define scope. And, there’s no direct link between that theory (the NSA doesn’t know a communication’s route) and operational scope. The dissent’s analysis has no limiting principle and, if adopted, would dilute the plausibility pleading standard to a near-nullity.
In sum, Plaintiffs lack standing to sue for a violation of the Fourth Amendment under the Dragnet Allegation because they can’t plausibly show that the NSA is intercepting their communications via a dragnet. From there, it follows that they also lack standing to sue for a violation of the First Amendment because “[all-legations of a subjective ‘chill’ are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.” Clapper, 133 S.Ct. at 1152 (alteration in original) (quoting Laird v. Tatum, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972)). Nor can Plaintiffs establish standing on the ground that Upstream surveillance compels them to take burdensome and costly measures. The Dragnet Allegation’s implausibility leaves them with nothing more than “fears of hypothetical future harm,” and they “cannot manufacture standing merely by inflicting harm on themselves based on” those fears. Id. at 1151.[11]
2.
Before concluding, we briefly address the dissent’s contention that our analysis of the non-Wikimedia Plaintiffs’ standing is superfluous.
Article III of the Constitution requires that we determine whether the non-Wik-imedia Plaintiffs have standing because the complaint rests upon the premise that the NSA is seizing each Plaintiffs unique communications. As such, it includes the following request for individualized relief: “Order Defendants to purge all records of Plaintiffs’ communications in their possession obtained pursuant to Upstream surveillance.” J.A. 84. Thus, the Constitution requires that each Plaintiff be able to plausibly allege the Fourth Amendment injury in fact that the NSA has seized its communications, because if a Plaintiff cannot do so it doesn’t have standing to, among other things, seek an order requiring the NSA to purge its records. To hold otherwise would be to sanction a shortcut around “the irreducible constitutional minimum of standing.” Lujan, 504 U.S. at 560, 112 S.Ct. 2130.
Horne v. Flores, 557 U.S. 433, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009), and Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), are not to the contrary. Each case is quite different from ours, rendering inapplicable the standing-avoidance doctrine which the dissent reads them to embody.[12] Critically, *217 in those cases each party for whom standing was at issue requested identical relief. Home, 557 U.S. at 443, 129 S.Ct. 2579; Village of Arlington Heights, 429 U.S. at 258, 97 S.Ct. 555. Thus, once the Court decided that a single party had standing, it made no difference to the resolution of either case whether any other party had standing. See Home, 557 U.S. at 446 & n.2, 129 S.Ct. 2579 (concluding that school superintendent had standing to seek vacatur of a district court’s orders in their entirety and declining to consider whether state legislators also had standing .to pursue identical relief); Village of Arlington Heights, 429 U.S. at 264 & n.9, 97 S.Ct. 555 (concluding that one individual plaintiff had standing to pursue declaratory and injunctive relief and declining to consider whether other individuals had standing to pursue identical relief); see also, e.g., Sec’y of the Interior v. California, 464 U.S. 312, 319 n.3, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984) (“Since the State of California clearly does have standing, we need not address the standing of the other respondents, whose position here is identical to the State’s.”).
Here, the Plaintiffs freely admit that they are not identical to one another. Instead, they fall into two different camps when it comes to demonstrating whether the NSA is seizing their communications. Moreover, the district court made an affirmative finding that none of the Plaintiffs had standing. Under these circumstances, we find it wholly appropriate (indeed necessary) to address fully this threshold question.
III.
For the reasons given, we vacate that portion of the district court’s judgment dismissing the complaint as to Wikimedia and remand for proceedings consistent with this opinion. We otherwise affirm the judgment.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

. Plaintiffs’ complaint incorporates this document.

. Plaintiffs’ complaint incorporates this report.

. Though all nine Plaintiffs made this allegation, only Wikimedia pursues it on appeal.

. Plaintiffs’ complaint incorporates this FISC opinion.

. By "chokepoint," Wikimedia refers to the 49 international submarine cables and the "limited number" of terrestrial cables that carry Internet communications into and out of the United States. J.A. 47-48.

. The "speculative claims” that the court referred to all relate to Wikimedia's allegation that the NSA is "using Upstream surveillance to copy all or substantially all communications passing through” chokepoints which the NSA surveils. J.A. 199.

. On appeal, Wikimedia attempts to rephrase this allegation so that it reads, "Wikimedia’s communications traverse every major [IJnter-net circuit entering or leaving the United States.” Appellants’ Br. at 24. We look, however, to the wording of the complaint. That said, the plausibility pleading regime doesn’t automatically invalidate allegations that contain probabilistic-sounding words. For the purpose of deciding whether the Wikimedia Allegation is plausible, we find this supporting allegation, based as it is upon other factual allegations, to be well-pleaded. Indeed, Wikimedia need only “state a claim to relief that is plausible on its face,” Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955). Construing, as we must, all well-pleaded facts in the light most favorable to Wikimedia, SD3, 801 F.3d at 422, Wikimedia's claim that its “communications almost certainly traverse” every chokepoint is enough to satisfy the plausibility requirement. J.A. 48.

. Like the Third Circuit, we assume without deciding that a heightened pleading standard does not apply to national security cases.

. We decline to decide whether Wikimedia has established third-party standing. Wikime-dia may, of course, raise that argument on remand.

. Plaintiffs also reference "another NSA document [which] states that, in support of FAA [(i.e., the FISA Amendments Act of 2008) ] surveillance, the 'NSA has expended a significant amount of resources to create collection/processing capabilities at many of the chokepoints operated by U.S. providers.’" J.A. 51 (emphasis added). As Plaintiffs note, there are "at least two kinds of surveillance” *214 under the Act—PRISM and Upstream. J.A. 40. Pointedly, and unlike in numerous other allegations throughout their complaint, including the immediately preceding one which references an “NSA slide illustrat[ing] the Upstream surveillance facilitated by just a single provider ... at seven ... chokepoints,” J.A. 50, Plaintiffs decline to specify which type of surveillance the NSA document refers to. Accordingly, we accept this allegation as true, but give it little weight.

. We reach the same conclusion as to Joshua Dratel, who is a member of the National Association of Criminal Defense Lawyers. He too cannot show that his communications are being intercepted via a dragnet, and the district court correctly held that the claim that one of his clients "has received notice of [Section 702 surveillance]” didn't plausibly allege that the NSA targeted his client with Upstream surveillance. J.A. 68.

. As for the dissent’s invocation of then-Judge Roberts's notable quotable that "if it is not necessary to decide more, it is necessary not to decide more,” context is key—that remark in a concurrence had nothing to do with standing, but rather pertained to the judge's disagreement with the majority's application of the Chevron doctrine. See PDK Labs. Inc. v. Drug Enf't Admin., 362 F.3d 786, 799, 803-04 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment). We don’t disagree with the general sentiment. It's just not relevant here.